WATERS–PIERCE OIL CO. v. VAN ELDEREN et al.

CHAMBERS et al. v. SAME.

(Circuit Court of Appeals, Eighth Circuit.  April 29, 1905.)

Nos. 2,042, 2,043.

**1. PROCEDURE ON WRITS OF ERROR.**

Although two actions for personal injuries by separate plaintiffs against the same defendants, growing out of the same accident, were by consent consolidated for trial, and were so tried to the same jury, who returned separate verdicts, on which separate judgments were entered, and one bill of exceptions, by consent, was made out, · yet two separate writs of error directed to the separate judgments were necessary. But where, as in this instance, two separate writs were sued out by the respective defendants, but directed to both judgments, and counsel for defendants in error thereafter stipulated with counsel for plaintiffs in error that the writs of error may be considered and treated as a single writ of error, etc., and then waited until after the lapse of the six months in which new writs of error might have been sued out, *held*, that the objection to the manner of suing out the writs should be overruled.

**2. NEGLIGENCE—JOINT DEFENDANTS—EVIDENCE.**

Where several defendants are sued jointly for negligence causing personal injury to the plaintiff, to warrant a joint judgment against the defendants the evidence must satisfactorily show that the acts of negligence co-operated concurrently or in continuous successive order, producing the common result.

**3. SAME.**

Where a gasoline plant was constructed by one defendant for one of the codefendants for lighting the latter's house, and when completed the servant of the latter was instructed by the builder of the plant how he should keep watch at the tank while the gasoline was being delivered by the third defendant, and such third party, on an order from such owner, brought a barrel of gasoline to be delivered into the tank through a receiving box on the outside of the building, where the party delivering it could not see the tank, such third party having no reason to apprehend that any of the appliances about the tank were not in perfect order, *held*, that in so delivering the gasoline into the receiving box such third party was not liable for an injury resulting from any overflow at the tank, unknown to him, while so delivering the fluid.

**4. SAME—SUFFICIENCY OF EVIDENCE.**

Where the evidence relied upon to support the verdict against such third party for personal injury to a person in said building, consequent upon the explosion of the gasoline which escaped, either at the tank or the receiving box, where the physical facts contradict mere deductions drawn from isolated facts testified to by witnesses, it is the duty of the court to see that a verdict against such third party shall not rest alone on the latter.

The existence of a fact is not proven by evidence of a subsequent condition which is merely consistent with its existence. Where the existence of the required fact rests upon surmises or speculative theory, rather than upon facts affirmatively established, it is the duty of the court to direct a verdict for the defendant.

**5. SAME—PROVINCE OF JURY—WEIGHT OF EVIDENCE.**

While the credibility of witnesses on disputable facts should be submitted to the jury for their determination, yet, where the evidence in respect of a given situation or fact is overwhelmingly persuasive, it is not to be maintained that any evidence to the contrary, however inconsequential and improbable, should carry the case to the jury.

6. SAME—INSTRUCTIONS.
    Although the court, in its charge to the jury, improperly injected into
    the case the question as to the negligence of the defendant in selecting
    and assigning an incompetent servant to perform a given duty, yet if,
    in the same connection, the charge made the liability of the employer to
    depend upon the ultimate fact that the servant at the time and place
    negligently caused the act which gave a cause of action, and, in addition
    thereto, such improper issue respecting the competency of the servant
    was rather prejudicial against the party recovering the judgment, such
    error should be disregarded.

(Syllabus by the Court.)

In Error to the Circuit Court of the United States for the Eastern District of Arkansas.

John D. Johnson (Eben Richards and Tom M. Mehaffy, on the brief), for plaintiff in error Waters-Pierce Oil Company.

C. V. Teague, for plaintiffs in error Chambers & Walker.

J. B. Wood (J. P. Henderson, on the brief), for defendants in error.

Before SANBORN and VAN DEVANTER, Circuit Judges, and PHILIPS, District Judge.

PHILIPS, District Judge. This is an action to recover damages for personal injuries sustained by the defendants in error (plaintiffs below) by reason of the explosion of gasoline on the 24th day of December, 1902, in the basement of what is known as the "Turf Exchange," at Hot Springs, Ark. At the time of the accident the Turf Exchange was under the control of the defendants Chambers & Walker as partners, on the first floor of which was conducted a saloon, and a room in which pools on races were sold. The defendant Arkansas Gas Company (hereinafter for convenience called the "Gas Company"), under contract with Chambers & Walker, constructed in the basement of said building a plant for lighting the building with the product of gasoline. The tank for holding the gasoline was let into the cement floor by sinking it about 6 inches, and was about 6 to 6½ feet long and 18 inches in diameter, and held about 67 gallons. It was placed horizontally between what is known as the engine and the coal house, with about 6 inches between the mound of the tank and the respective walls of the two rooms. The mound around this tank was made of two layers of brick laid on edge and cement plaster, and plastered over with a thick layer of cement, so as to form a smooth, arched mound, 7 to 7½ feet long, and 12 inches above the level of the area floor, which practically filled the space between the engine house and the coal shed, with a slope towards each. The generating machine was located in said engine room, which was about 7 feet by 7 feet in size. There was a granitoid paving floor in said engine house, and the house was raised on blocks 2 or 3 inches above this pavement, so as to leave a space between the superstructure of the engine house and the granitoid pavement. The coalhouse was about 8 feet long and 7 feet wide—a rude wooden shed—the east wall of which was double, next to the outside wall, where the receiving box hereinafter mentioned was located. The bottom of

this coalhouse was uncemented, and had a rude plank floor running horizontally. In the rear and a few inches lower than the first floor of the Turf Exchange was an open area or yard of the same width as the building, extending back about 16 feet, to a stone retaining wall 12 or 13 inches thick, located on the line of Exchange street, on which the rear of the premises abutted. The top of this retaining wall was 8 or 9 feet above the area, and nearly level with the adjoining sidewalk, on top of which was a tight board fence, 6 or 7 feet high, and a door opening from the street to a platform on the sidewalk reaching down into the area. The whole area, with the exception of the coal shed, was paved with granitoid. There was an open urinal at the north side of the area. Near the rear wall of the Exchange building, on the northeast corner, was a drain opening, with a grate cover, for draining the area.

The gas machine plant consisted of an engine and generator. The storage tank had pipes connecting it with the engine, as also a line of pipes connecting the tank with an iron receiving box on the sidewalk on Exchange street, outside of the retaining wall. Through one of the small iron pipes connecting the tank with the generating machine, the machine automatically drew from the tank its supply of gasoline, and through the other discharged back into the tank any surplus fluid. To the top of the tank there was also attached, near its south end, an upright iron pipe, a few inches long and 1½ inches in diameter, which is known as the "T pipe," or the "upright T pipe." The upper end of this pipe had threads cut in it, and was fitted with an iron cap, readily screwed off and onto the pipe. Inside of the tank was a "float," with an upright wooden stick, less than an inch in diameter, which extended through the upright T pipe for the purpose of indicating the quantity of gasoline there was in the tank while the latter was being filled. With the cap off the upright pipe, the end of the stick would rise up out of the pipe as the gasoline was run into the tank. When the tank was full this stick would stand about 6 or 8 inches out of the pipe, and when empty the end of the stick would be flush with the end of the pipe. After the tank was filled the stick could be pushed down, and the cap screwed on the end of the pipe. This pipe was to be kept closed, except when the tank was being filled, or it was desirable to know how much gasoline was in the tank.

The line of pipe connecting the storage tank with the receiving box was about as follows: The end of a line of pipe of the same inside diameter as the upright T pipe on the storage tank was attached at right angles to the latter pipe near where it joined the top of the tank, extending horizontally and obliquely with the tank from 3 to 3½ feet, very near the outside east wall of the coal shed; thence up vertically through the shelves 6 feet 3 inches; thence at right angles with the tank through the east wall of the coal shed to an open space to the stone retaining wall, to a point 12 to 15 inches outside of the latter wall, and 12 inches below the surface of the sidewalk on Exchange street; thence vertically about 6 inches to the bottom of a cast-iron box known as the "receiving box," and having a 1½ inch opening through the bottom, to which

the end of the 6-inch vertical pipe was attached. This receiving box was about 6 inches long, 5 inches wide, and 6 inches deep, with a hinged lid, and lock for locking the same when the box was not being used. It also had, extending up from the bottom 2 or 3 inches, an open nipple or pipe, with threads on it for receiving a cap. This open nipple was a continuation of the opening in the end of the pipe attached to the bottom of the box. There was also an open nipple extending through its bottom as a ventilating pipe, but not connecting with the apparatus for filling or operating the tank. This box was sunk in the sidewalk a few inches from the retaining wall, with bricks laid around it, and covered with cement, so as to leave about 1 inch of the box projecting above the bricks and the surface of the sidewalk. From the foregoing measurements, there was a continuous line of 1½-inch pipe from the receiving box in the sidewalk to the storage tank, about 19½ feet total length, about 12 feet of which was horizontal, and 7½ feet vertical, extending across the upper part of the coal shed. There was another small pipe, about one-half inch in diameter, connected with the top of the tank, extending horizontally over the outside wall of the engine house, and thence up vertically about 3 feet. The upper end of this pipe was left open, but immediately above it was a little metal hood, which was attached to the wall of the engine house, so as to extend or hang over the open end of the pipe. The principal purpose of this pipe was to permit the escape of vapor gas, which would rapidly form in the tank while the same was being filled, with the idea that otherwise the gas thus generated would prevent the free inflow of gasoline. The upper end of the upright T pipe extended about 3 inches above the mound.

On the 20th day of December, 1902, the gas company had completed the construction of this plant, with the exception of connecting the piping from just above the tank with the receiving box on the sidewalk. On the afternoon of that day, Humphreys, the representative of the gas company who constructed the plant, sent in a telephone order to the plaintiff in error, the Waters-Pierce Oil Company (hereinafter designated as the "Oil Company"), which had a supply house in Hot Springs, to send to the Turf Exchange a barrel of gasoline; such barrel containing about 53 gallons. The barrel was accordingly sent, in charge of one Murray, the deliveryman of the oil company. This barrel was carried down to the sidewalk at the Turf Exchange, and the transfer of the gasoline into the tank was effected by siphoning it by means of a rubber hose into the T pipe. That evening the lighting plant was put into operation, and the building was thereafter so lighted until the time of the explosion hereinafter mentioned. Between the 20th and 24th of December, 1902, the connection of the tank, by piping, was made with the receiving box, when Humphreys claimed that the contract of the gas company with the Turf Exchange was completed.

On the afternoon of the 24th of December, 1902, a telephone order was sent in to the oil company for a barrel of gasoline, to be delivered forthwith at the Turf Exchange. Accordingly, about 4 o'clock p. m., said Murray arrived with the barrel on the delivery

wagon at the pavement near the receiving box, the place where he was advised at the former delivery the next delivery would be made; and, as directed, he entered the poolroom of the Turf Exchange, and, seeing the porter, named Harris, whom he understood was the person to be seen respecting the delivery of gasoline, informed him that he had the barrel outside for delivery. Harris answered, "All right," and said he would get the key and unlock the lid on the receiving box, and accompanied Murray to the wagon. Murray went to a near-by house to get a wrench with which to remove the tap on the barrel, and when he returned the man Harris had the receiving box unlocked and ready. Murray asked Harris if he had a funnel. Being answered in the negative, he made one out of stiff manila paper, and inserted it in the orifice of the pipe in the box, and inserted a rubber hose one inch in diameter in the barrel, at the other end of which was a goose neck three-fourths of an inch in diameter, with which he siphoned the oil out of the barrel into the pipe at the receiving box. After this connection was made, Harris went down to the tank to take his position as he had been directed to do by Humphreys, in the presence of Murray, on the occasion of the delivery of the barrel of gasoline on the 20th of December. Murray held in his hand the hose, so as to maintain the goose neck in its proper position in the funnel. From his position he could not see the tank, and necessarily depended upon Harris for taking observations at the tank. Harris claims that he went to his post of duty on the tank, so as to observe the indicator stick, as he had been directed, but claims that he did not observe any rise or fall of this stick. A patron of the poolroom came down the steps into the areaway to go to the urinal, when he discovered, by the odor, the presence of gasoline, and that it was running in a stream about six inches or more wide, and perhaps an inch deep, on the granitoid pavement from the engine house, in the direction of said sink, and called the attention of Harris, who testified he was sitting on the tank, to this fact. Thereupon Harris hallooed up to Murray to hold on. Murray, not knowing what the matter was, disengaged the goose neck from the funnel, and laid it upon the barrel or wagon, and, after waiting a minute or so, not hearing more, went down and inquired of Harris what the trouble was. When informed by Harris that the gasoline was running on the floor, Murray made examination by putting his hand into the gasoline and smelling it; and, being satisfied that it was gasoline, he undertook to close the doors and put down the windows to prevent accident, but some one probably had a lighted match or cigar, which communicated with the evaporation, and the explosion immediately occurred. The force of this explosion was immediately above the engine room, making a wreck of the poolroom, killing some persons therein, and injuring others. Among the injured were the defendants in error, Van Elderen and Gaskins.

There are other important facts bearing upon the questions involved in this review, which will more fully appear from the following discussion.

137 F.—36

Van Elderen and Gaskins brought separate actions for damages, jointly, against said oil company, the gas company, and Chambers & Walker. The charging part of the petitions is as follows:

"The defendants, acting together and in concert, through their agents, servants, and employés, then and there wrongfully, unlawfully, carelessly, and negligently proceeded to transfer said gasoline from the vessel in which it was carried to said lot, and to store the same in said tank or vessel situated on said lot, and in so transferring said gasoline the said defendants wrongfully, unlawfully, negligently, and carelessly allowed a large quantity of gasoline to leak, escape, and run on and under the floor of the building, and unlawfully, negligently, and carelessly allowed and caused said gasoline to explode and wreck said building, and inflict great and serious injuries to the persons then in the building;" describing the injuries received, respectively, by the defendants in error.

As the two cases grew out of the one accident, and depended upon the same state of facts, by consent of parties they were consolidated for the purpose of trial, and were tried to the same jury. The jury returned a verdict in favor of Van Elderen against the oil company and Walker & Chambers, assessing his damages at $12,500, and in favor of Gaskins against the same parties, assessing his damages at $3,000, and returned a verdict in favor of the defendant the Arkansas Gas Company.

To reverse the verdicts against the oil company and Chambers & Walker, they brought the case here on writs of error. While there were separate writs of error sued out by the respective defendants below, they were directed to both judgments. The cases are submitted here on briefs of the respective parties, as well as on oral argument. In the brief filed by counsel for the defendants in error, for the first time, the question is raised that there should have been separate writs sued out by each of the plaintiffs in error against each of the defendants in error, and therefore the writs should be dismissed.

It may be conceded that although the two cases, for convenience and economy, were consolidated for trial, and are covered by one bill of exceptions, yet, where there are separate verdicts and judgments, they are so independent of each other as to require separate writs of error. Louisville & Nashville R. Co. v. Summers, 125 Fed. 719, 60 C. C. A. 487. But there are two considerations apparent in these cases which should disentitle the defendants in error to the benefit of this technical objection. The writs of error were sued out on December 30, 1903, and the transcript of the record and proceedings was filed in the clerk's office of this court February 29, 1904. On the 18th day of March, 1904, the parties, by their respective attorneys, filed herein the following stipulation:

"Waters-Pierce Oil Company, Plaintiff in Error, vs. Johannes Van Elderen et al., Defendants in error. (No. 2,042.)

"R. C. Chambers et al., Plaintiffs in Error, vs. Johannes Van Elderen et al., Defendants in Error. (No. 2,043.)

"It is hereby stipulated and agreed by and between the parties to the above-entitled causes that the writs of error therein may be considered and treated as a single writ of error; that the record in the two causes may be printed, considered, and treated as one and the same record; and that the two causes may be argued as one cause."

Not until the filing of the brief on behalf of the defendants in error, October 25, 1904, after the statute of limitation had run against the right of review by plaintiffs in error, was any objection raised as to the effect of the writs sued out. The stipulation entered into by counsel of the defendants in error on March 18, 1904, "that the writs of error therein may be considered and treated as a single writ of error; that the record in the two causes may be printed, considered, and treated as one and the same record; and that the two causes may be argued as one cause"—was calculated to induce plaintiffs in error to believe that no technical objection would be raised respecting the writs of error. If counsel did not understand that the stipulation waived the present objection, they should have moved promptly, under the circumstances, for a dismissal, instead of waiting until after the expiration of the six months; and for this reason we hold that justice demands that the objection should be overruled.

The oil company seeks a reversal of the judgment against it on the ground that the trial court should have directed a verdict for it on the evidence. This has necessitated a thorough examination of all the evidence. The whole controversy, in its last analysis, ranged around the question as to whether the gasoline escaped after it reached the tank, or whether it occurred at the receiving box. If it was because of the faulty construction of the pipes or the tank, the gas company was liable. If there was no such defective construction, then it is insisted by defendants in error that the injury was attributable to the negligent acts of the two servants, Murray and Harris. To warrant a recovery against both the oil company and Chambers & Walker, the evidence must show satisfactorily that their acts of negligence, if any, co-operated concurrently or in continuous successive order, producing a common result. With the construction and operation of the gasoline tank the oil company had nothing to do. Its first connection with it was on December 20, 1902, when Murray delivered the barrel of oil on request of Humphreys. From instructions then given by Humphreys to Harris, the latter was given to understand two things: First, that the next delivery of oil would be at the outside box; and, second, that Harris was to watch the tank on the inside as the agent of the proprietor of the building to receive it. That the order sent in on December 24th by telephone for the delivery of the second barrel of gasoline came from the Turf Exchange, there is little ground for controversy. Humphreys testified that he did not send in this last order, and that he left Hot Springs for Little Rock at least two hours prior to the time the order was telephoned to the oil company. That Harris, who was the acting porter at the Turf Exchange, understood that he was to receive the oil, is evidenced by the fact that, as soon as Murray said to him, "I have a barrel of gasoline for you," he said, "All right." By their verdict against Chambers & Walker, the jury found that Harris was acting for them. And as defendants in error insisted below that Harris was the servant and agent of Chambers & Walker, they are estopped from disputing this fact.

· When Murray delivered the oil at the box at the outside of the building, the designated place of delivery, the vendor had complied fully with its undertaking, unless the evidence shows that his act of delivery was performed in such negligent manner as to occasion the escape of the gasoline on to the floor of the area way. In this connection we will answer the suggestion that Murray was guilty of negligence in not using a rotary pump in transferring the gasoline from the barrel to the receiving box, instead of siphoning it with the rubber hose. This contention is predicated of what occurred between the man Humphreys and Murray on the occasion of the delivery of oil on the 20th of December. It is quite manifest to our minds that the whole incident of siphoning into the tank on that occasion presented the following situation: From the location of the barrel when the gasoline ran directly through the hose into the T pipe, the short pipe not being plugged, the flow of gasoline into the tank caused it to flow out of the short pipe. Humphreys made no protest against siphoning until he discovered the overflow. Then he scolded Murray, and, according to his version, told him never to use the hose in that way, but to use a rotary pump. Humphreys then looked for a plug to close up the open end of the pipe. Murray was then and there informed by Humphreys that the connection of the pipe line with the receiving box would be completed before the next delivery, and Harris, the servant of Chambers & Walker, received particular instructions as to keeping watch at the tank to observe the movement of the indicator stick, which would indicate the flowing of the fluid into the tank. Murray had the right to assume that the appliances at the tank were properly arranged, and that therefore the objection to the siphoning process would not obtain, as, in the nature of things, there could be no escape of the gasoline after it entered the flow pipe at the box if the tank and its appliances were in order and properly watched—a duty that did not devolve upon Murray, as it was well known to all the parties that from his position at the receiving box he could not observe the effect of the delivery at the tank. Unless, therefore, the plaintiffs' evidence tended to show that there was more danger in employing the siphon method at the time and place, within the knowledge of the oil company or·its agent, and such method occasioned the injury, no recovery is predicable of the use of the siphon.

The cross-examination of this man Humphreys shows that he was not an expert in the matter of using the siphon under the conditions which existed at the time of the delivery of the last barrel, and that his statement at this trial was mere matter of speculation. The following excerpts from his examination speak for themselves:

"Q. Did you tell him [Murray] never to use a siphon? A. I told him to use a rotary pump. Q. What did you do that for? A. Because I thought it was the proper way to put the gasoline into the tank, because with the rotary pump you can control the flow of the gasoline—put it in fast or slow. Q. Had you ever used a siphon before that time? A. Yes, sir. Q. When was that? A. I don't remember exactly. Probably in my other testimony you attempted to pull it out of me. Q. I. am asking you now when and how you used it? A. I don't know the exact date. Q. Had you used it several times?

A. Several times. Maybe once or twice. I used it before, and that is all I am going to say. Q. Didn't you say that you hadn't used it but once, and that was in making a test? A. I have used it before. That's all I am going to say. Q. Can't you regulate the flow of gasoline more readily and stop the flow more quickly with the siphon than the rotary pump? A. Yes; I can stop it quickly by letting it squirt all over my face; but with the pump I can readily control it, and not have it all over my face. Q. If you, use the rotary pump and' hose, can you absolutely stop the flow of gasoline instantaneously? A. It will not be necessary for the hose to be full. Q. After you have stopped it, won't there still be all the gasoline the hose did hold, to go through it? A. I had my hand over it, using a siphon, and got it all over my face. Q. The reason that you didn't want the siphon used is that the flow would be too great and discharge the oil too readily? A. My objection was that it should be squirting around after it was discharged. With a pump you can stop it before it goes into the hose. Q. I am asking you for your reason for not using a siphon? A. One thing, as I said before, if you raise up the end with it, just as soon as you leave the hole it will squirt right out in the air."

In this connection the court interposed with the statement that it was useless to ask these questions, as "this is not expert testimony, and the jury will judge it by experience and common sense. They know, if you turn the hose up, it won't run out, whatever an expert may say. Expert testimony is only an opinion."

On the other hand, the testimony of the real experts in the case —the men who handled and transferred gasoline from one reservoir to another—was that a rotary pump is used in transferring fluids from a lower to a higher vessel, and a siphon is used in transferring from a higher to a lower vessel. As the witness Humphreys had never in fact experimented with the use of the siphon, and the only fact to which he, in effect, testified was that in disengaging the siphon hose the handler was liable to have the gasoline spurt in his face, no verdict should be permitted to stand, predicated of such imputed act of negligence.

Superadded to all this is the fact that, in the various experiments made with the siphon hose and the rotary pump afterwards from a gasoline barrel through a similar pipe, there was no difference in the effect produced. In fact, this witness Humphreys testified that in the experiments afterwards made by him with the hose and goose neck, without a rotary pump, with a tank properly equipped, there was no escape whatever of gasoline from the tank. It should not, therefore, lie in the mouth of counsel for defendants in error to claim that there was any actionable negligence on account of siphoning the oil out of the barrel into the receiving box.

Again, the uncontradicted testimony of Murray is that at the only other tank at Hot Springs where he delivered gasoline, in delivering it from a wagon into a receiving box, he used the siphon method without any difficulty. The only difference in the two situations was that the latter receiving box was more directly over the tank. But it is not apparent, upon any known law of hydrostatics, how the conveyance of the fluid first through a pipe descending about 12 or 15 inches to the pipe which ran horizontally 7 feet across the coalhouse, and then through an elbow before it had a direct fall into the tank, could occasion any more reflux movement of the fluid

after reaching the tank, so as to overflow, than a direct, uninter-rupted flow of the fluid from the box to the tank.

As the defendants in error insisted below, and the jury found, that Chambers & Walker were liable, it was upon the theory that Harris was guilty of negligence. He could not have been guilty of any actionable negligence without the predicate that the oil escaped after it descended through the pipes to where its running would pass under the responsible watch of Harris. This proposition unavoidably includes the fact that the oil did not escape at the box, but after it left it and passed beyond the view and control of Murray, unless the further proposition can be maintained that the oil escaped simultaneously at both points. This latter position involves the double attitude that the oil escaped at the receiving box and also at the tank, and that the two streams, starting from different points, uniting somewhere and somehow, constituted the stream running out from under the engine house, as no other stream was seen or traced elsewhere, and the explosion, beyond reasonable controversy, occurred from the stream that ran out under the door from the engine house through the area. This contention, to our minds, involves presumptions against all the physical facts, and rests upon mere theoretical conjecture.

The only scintilla of evidence touching the overflow of any gasoline at the receiving box was that of the witness Cohen. After several trials had occurred in the courts, growing out of this explosion, this witness, although he claims to have communicated the fact to Judge Teague, counsel for defendants in error Chambers & Walker, soon after the occurrence, is introduced at this trial, and stated, in substance, that in the afternoon of the next day after the explosion he was passing by this receiving box in company with a gentleman, a resident druggist of Hot Springs, when they discovered in the box the presence of a fluid, which he thought was perhaps an inch deep, and that his companion said it was gasoline. He did not examine it, and was unable to say that it was gasoline, but thought it was. To say nothing of the physical improbability that so volatile a substance as gasoline of that depth, which the evidence shows will evaporate in a very few minutes, would be found in this box 22 hours afterwards, if it were conceded that it in fact was gasoline, it is explained by the uncontradicted testimony of the witness Murray that in disengaging the nozzle of the hose from the funnel he spilled some gasoline in the box. In addition to this, the witness Russell, who examined the box on the evening after the explosion, testified that the box was then open, and there was no gasoline in it. Furthermore, the testimony of Murray that no oil escaped at the box while being delivered into the funnel is corroborated by what may be aptly termed the res gestæ. It was broad daylight, and he was standing over the box, holding the goose neck in the funnel, and could not help seeing any overflowing oil. It is contrary to the very nature of things that if oil was escaping at the box it would not at once have attracted his attention, and he would have stopped the flow. This would have been instinctive. Again, when Murray heard the outcry from Harris to hold on, he

pulled up the hose, and within a minute or two went to Harris with the inquiry, "What is the matter?" which shows that there was nothing where he stood to indicate why he should be asked by Harris to stop. And even when he went down and discovered the stream of oil, he put his hand into it to verify the fact that it was oil.

For the purpose of showing that Murray deserted his post while delivering the oil into the receiving box, and that possibly the oil might have escaped then, defendants in error introduced one Archer, who was in the employ of this Turf Exchange as watchman, claiming to be a constable, and who has a suit pending against these same defendants, growing out of this accident, who testified that just a short time—perhaps five or six minutes—before the explosion he saw Murray in the poolroom. Leaving the credibility of this witness to the jury, it is difficult not to say that as to the question of time, under such circumstances, an honest witness is liable to be mistaken. Murray was in the poolroom, as both he and Harris testified, as he went in there to notify Harris of the arrival of the gasoline. But that he returned to the poolroom after Harris left him is challenged by the physical facts of Murray's situation. Harris left him holding the hose with the nozzle in the paper funnel when he went down to the tank, and it was necessarily but a few minutes thereafter when Harris called out to Murray to hold on. Murray was then at his post. Necessarily he had to hold the hose with the nozzle in the paper funnel. The nozzle would have dropped from the funnel the moment he let it go. The testimony of Cohen so challenges the common sense and experience as to disentitle it to any consideration whatever.

We are now brought in this discussion to a consideration of the physical facts, which, in our judgment, absolutely forbid giving credence to the theory that the gasoline which ran from under the engine house escaped at the receiving box. There were but two ways possible for the oil to have thus passed from the receiving box—either by overflowing at the box and passing over or through the wall, and traversing the coalhouse, and passing by the south end of the tank into the engine house, or by overflowing at the mouth of the pipe in which the funnel was inserted, and running into the vent pipe, and thence, from the bottom thereof, through the wall, and reaching the engine house, as above indicated. Against the first theory there are insurmountable physical obstacles. The evidence, by an overwhelming weight, shows that the surface around the top of the receiving box was cemented, and so constructed as that the flow of the fluid would have been from the building toward the street. It is true that some witness for the defendants in error testified that, in times of rainfall, water sometimes would run from the sidewalk over this wall into the coalhouse. But there was no evidence that this had occurred after the construction of the cement mound around the receiving box, or that the oil could have run from the box over this wall. Against the other theory, that the oil descended through the vent pipe, is the uncontradicted fact that the orifice where the funnel was insert-

ed was lower than the mouth of the vent pipe, and, further, that the vent pipe rested on hard ground, which resisted the penetration of a stick inserted therein to test this very fact.

As a dernier ressort, it is contended that the gasoline might have passed through the 15-inch retaining wall, through the aperture made therein for the passage of the 1½-inch pipe which connected with the receiving box, and that, having passed either over the wall or through it, it was conveyed by a door used as a shelf in that end of the coalhouse to the partition wall between the coalhouse and the tank, and down this wall and underneath thereof, and thence around the south end of the tank into the engine house. 'This is a mere theory conjured up in the fertile mind of counsel, without any substantial basis of fact for it to rest on. No experiment was made to demonstrate the fact that a fluid which overflowed at the receiving box would run thence over the retaining wall and down onto this door. No experiment was made to show that any fluid poured into the vent pipe would pass through the hard soil at the bottom thereof through this aperture in the wall, and would thence run on the door. It is true that there was evidence tending to show that the door which was used as a shelf in the coalhouse rested at one end on a shoulder in the wall. To give any color of support to the theory that this rapidly evaporating substance of gasoline could have run the length of the door, and by that means have reached and passed around the south end of the tank, the evidence should have shown that the door lay at such an angle as that the gasoline would run in the required direction, and how it could pass off at the end of the door and reach the required destiny. There is not one word of evidence to establish this essential fact. On the contrary, the evidence is that the other end of the door rested upon some barrels. Whether or not that end of the door joined up against the partition wall of the coalhouse is not shown. If the gasoline had run the whole length of the coalhouse—seven feet and more—along the door, necessarily it would have passed therefrom down into the coalhouse. The coalhouse had coal in it, with a quantity of débris, consisting of boxes and straw; and beneath the wooden floor of this coalhouse was dirt, the floor of which was lower than the cement floor where the tank and engine house were. Necessarily the gasoline would have passed that way and been absorbed. In addition to this, experiments afterwards made, in which barrels of water were discharged from the outside into this coalhouse, showed that not a particle of the fluid escaped from the coalhouse, but was retained or absorbed therein. Experiments made showed that, in running down a plank eight or ten feet long the gasoline almost entirely disappeared by evaporation. No explosion occurred in the coalhouse, which necessarily would have been the case, had there been a continuous stream from the receiving box to the engine house.

If the imagination could be indulged to the extent of carrying the gasoline through the wall and onto the door, and down the door over its end to the floor beneath, then to reach the engine house, counsel for defendants in error was driven to the further contention that

it passed between the cement mound around the tank and the wall. The witness McMullen, who did the brick and cement work around the tank, testified that the cement mound extended close up against the south wall. His evidence excites belief, because he entered into particularities indicative of an actual occurrence. He says that the end of the tank lacked three inches of coming to the wall, and told how he fixed this by filling up the space between that and the wall with brick and cement. It is true that the witness Archer, who testified about seeing Murray in the poolroom just before the explosion, testified that, on some occasion when interrogated by him, McMullen said, in effect, that this space was not cemented up to the wall. As he was sent to McMullen for the purpose of trying to entrap him, no honest mind should be influenced by his testimony. Dr. Shaw, coroner, who examined this space between the tank and the wall carefully just after the accident, testified that the space was cemented up against the wall. A number of other disinterested witnesses testified to the physical fact that after the tank was removed there was cement clinging to the wall, evidencing the fact that the space had been so filled. The photograph in evidence, taken of this tank and its surroundings shortly after the explosion, before any question had arisen as to whether or not the space between the tank and the wall was so filled, shows the mound to be continuous to the wall. There is nothing in the evidence to justify the contention in argument that this result was attributable to the position in which the instrument taking the photograph was placed. Should the fragmentary statements of one or two witnesses introduced by defendants in error, to the effect that they thought there was a space not closed up between the tank and the wall, prevail over these well-established facts? The now better recognized rule is that, where the evidence in support of a given situation or fact is overwhelmingly persuasive, it is not to be maintained that any evidence to the contrary, however inconsequential and improbable, should carry the case to the jury for their determination.

The tank reservoir held 67 gallons, and the barrel contained 53 gallons of gasoline. After the delivery from the barrel on the afternoon of December 24th, there were left in the barrel, according to the testimony, about 17 gallons. So that about 36 gallons had been delivered at the receiving box. There were 40 gallons in the tank after the explosion; and if, as the testimony tends to show, there were about 12 or 16 gallons in the tank when the filling began, from 24 to 28 gallons undoubtedly ran into the tank from the receiving box. If that number of gallons ran into the tank, why did not the other gallons run in? What would stop the flow from the receiving box into the tank, except the filling of the tank, or the escape therefrom after it had descended through the pipe? All the evidence worthy of credence, from all the experiments made, shows that when the gasoline runs through the pipe into the tank, the fact would be indicated by the rising and falling of the indicator stick; and yet the man Harris, to avoid his responsibility, testified that the stick did not move during the process of filling. This demon-

strates to an absolute certainty one of two things—either that Harris was not watching, or that the tank or its escape pipes were not as they should have been. The physical facts utterly discredit Harris as a witness, and the jury disbelieved him; otherwise it could not have found a verdict against Chambers & Walker.

Furthermore, after the accident in question the oil company made different experiments under like conditions, which demonstrated the fact that gasoline conveyed from a barrel at the same distance and the same elevation, and with the same appliances, into the receiving box, descended into the pipes without any overflow at the box. The experiments were not only conducted by the use of the hose siphon, but with the rotary pump, with the same result. To one of these demonstrations everybody at the courthouse, by proclamation, including the counsel for defendants in error, were invited to be present. Said counsel and friends did attend the experiment. There was no interested performance not visible to the eye of the adversary parties. These experiments demonstrated that out of about 25 gallons of oil thus delivered through the pipe into the tank, about 9 gallons overflowed through the T pipe; thus showing how the oil overflowed, and in a quantity that well accounted for the stream of gasoline which was discovered running from under the engine house. Counsel for defendants in error, who was present at this demonstration, entertained the idea that the oil was being delivered too rapidly, and requested that they slow up with the delivery. This was done, with no different result. After the man Humphreys, representing the gas company, was advised of the effect of this test, he made experiments on his behalf, by which he claimed that it was demonstrated that the oil would not thus escape through the T pipe. No unprejudiced, honest mind can read the testimony respecting the experiments conducted by Humphreys without the conviction that it was unfair and dishonest. The president of his company and a stockholder were the principal witnesses, with a few selected outsiders. He gave no notice thereof to the adverse party, and afforded it no opportunity to observe or criticise the manner of its conduct. He took care to see that the barrel of gasoline was not placed at the same elevation as was the barrel at the time of the accident. He took especial pains to manipulate the hose himself, letting it run a few minutes at a time. One spectator would look at it for a few minutes and leave, and another would be brought in to observe under his manipulation. His own experiment, however, demonstrated the fact that during the process of the inflow of the gasoline from the pipe the indicator stick moved up and down.

While it may be said that all this was matter for the consideration of the jury, it does but accentuate the fact and deepen the impression that this whole case, as against the oil company, was made to order. The evidence as against it throughout rests upon conjecture and speculative theories, unsustained by reliant affirmative testimony, and by building upon one presumption another presumption. The doctrine of locus ipsa loquitur, invoked by counsel for defendants in error, can have little force, for the reason that the decided weight of the evidence shows there was another place

for the escape of oil, which speaks louder than that at the receiving box.

As said by Mr. Justice Brewer in Patton v. Texas & Pacific Railway Company, 179 U. S. 658, 663, 21 Sup. Ct. 275, 45 L. Ed. 361:

"It is not sufficient for the employé to show that the employer may have been guilty of negligence. The evidence must point to the fact that he was. And where the testimony leaves the matter uncertain, and shows that any one of half a dozen things may have brought about the injury, for some of which the employer is responsible, and for some of which he is not, it is not for the jury to guess between these half a dozen causes, and find that the negligence of the employer was the real cause, when there is no satisfactory foundation in the testimony for that conclusion. If the employé is unable to adduce sufficient evidence to show negligence on the part of the employer, it is only one of the many cases in which the plaintiff fails in his testimony, and no mere sympathy for the unfortunate victim of an accident justifies any departure from settled rules of proof resting upon all plaintiffs."

In Sorenson v. Menasha P. & P. Co., 56 Wis. 338, 14 N. W. 446, which is apposite, it was said:

"When the liability depends upon the carelessness and fault of a person or his agents, the right of recovery depends upon the same being clearly shown by competent evidence; and it is incumbent upon such plaintiff to furnish such evidence to show how and why the accident occurred—some fact or facts by which it could be determined by the jury, and not left entirely to conjecture, guess, or random judgment upon mere supposition, without a single known fact."

So, in Trapnell v. City, etc., 76 Iowa, 746, 39 N. W. 885, the court, speaking to a like condition, predicated of circumstantial evidence, said:

"While an injury by external force might have caused it to develop, it may also have developed without such cause. Before the plaintiff can recover on account of the expenses and suffering caused, * * * she must establish that the relation of cause and effect existed between the fall and them. But when we look into the evidence we find that it merely establishes a condition which might have been caused by an injury to the breast at that time, but whether such injury did occur is, under it, but a matter of surmise. The existence of a fact is not proven by evidence of a subsequent condition which is merely consistent with its existence."

Our conclusion is that the court below should have given the instruction requested, directing a verdict in favor of the oil company.

In respect of the verdicts and judgments against Chambers & Walker, no question is made as to the sufficiency of the evidence to go to the jury. The only serious error assigned and discussed as ground for reversal is as to the portions of the charge of the court to the jury touching the responsible agency of the colored man, Harris. This objectionable feature of the charge is as follows:

"Do you find that reasonable diligence was exercised by the person in selecting him—in putting him in charge—as shown by the evidence; and, if so, did Arthur Harris exercise such reasonable diligence commensurate with the danger of this plant? * * * If you answer either of these questions in the negative, then the party in whose employ he was at that time and in this particular matter is liable, if his negligence caused or contributed to the explosion."

It must be conceded that it was improper to inject into this case any question respecting any negligence on the part of Chambers & Walker in employing Arthur Harris to perform, or as to his competency for, the duty assigned him, for the palpable reason that no such issue is tendered by the pleadings. But how can the plaintiffs in error Chambers & Walker avail themselves of this error? It is not apparent how it could possibly have affected or prejudiced their defense. Although the jury might have found that reasonable diligence was not exercised in selecting Harris and putting him in charge, yet, as the liability of Chambers & Walker was ultimately made to depend upon the question of fact as to whether or not, at the time and place, Harris' "negligence caused or contributed to the explosion," it is made apparent that no harm was done to Chambers & Walker by the first part of the charge. On the contrary, the effect of the charge was rather to increase the burden of proof on the part of the plaintiffs below. This will at once be made manifest by assuming that the verdict had been for the defendants below. With irresistible effect the plaintiffs below could have complained that the charge laid upon them the additional burden of proving the want of due care in selecting a servant, or the fact of his competency, with knowledge on the part of the employer, and that the verdict of the jury might have been influenced by the fact that they believed that Harris was a competent servant, and that that fact might have influenced their conclusion that on this particular occasion he was not guilty of negligence causing or contributing to the explosion. But in so far as Chambers & Walker are concerned, the jury were instructed, in effect, that, if they found that reasonable diligence was not exercised in selecting and putting Harris in charge, there could still be no liability attaching to Chambers & Walker, unless Harris' "negligence caused or contributed to the explosion."

Other matters discussed by counsel in behalf of Chambers & Walker are not deemed of sufficient importance to further prolong this opinion.

It results that the judgments against Chambers & Walker are affirmed, and the judgments against the Waters-Pierce Oil Company are reversed, and the cases as to it are remanded for further proceedings in accordance with this opinion.