### PITTSBURGH COAL CO. v. MYERS.

(Circuit Court of Appeals, Third Circuit. February 25, 1913. Rehearing Denied April 11, 1913.)

#### No. 1,635.

1. MASTER AND SERVANT (§ 265*)—DEATH OF SERVANT—NEGLIGENCE—PRESUMPTION—PROXIMATE CAUSE.

A servant's death raises no presumption of his master's negligence, but such negligence, to be actionable, must be affirmatively shown, and must also be shown to have been the proximate cause of the death.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 877–908, 955; Dec. Dig. § 265.*]

2. MASTER AND SERVANT (§ 129*)—DEATH OF SERVANT—PROXIMATE CAUSE—NEGLIGENCE.

Decedent was killed while working as a brakeman in the underground operations in defendant's mine. A train of cars had been drawn into the mine by an electric motor, and as the train approached a junction a flying switch was made to run the cars upon a sidetrack to the point

where they were to be loaded. When the cars left the junction, decedent was alive, and on or inside the rear car. In the immediate neighborhood of a second switch which it would have been his duty to turn, the trolley wire crossed the gallery at a height of five feet eight inches above the rails, which might have shocked him or thrown him off. There was no stationary light at the second switch, and the headlight on the motor was ineffective. As the motor overtook the cars, it ran over something on the rail, which was afterwards discovered to be decedent's body. Decedent was accustomed to the work, had passed along the gallery 10 times a day for several months, and had helped put up the traction system. *Held*, that the cause of decedent's death was uncertain, and that the facts did not warrant a conclusion that defendant's negligence was the proximate cause thereof.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 257–263; Dec. Dig. § 129.*]

In Error to the District Court of the United States for the Western District of Pennsylvania; Charles P. Orr, Judge.

Action by Annie Myers against the Pittsburgh Coal Company. Judgment for plaintiff, and defendant brings error. Reversed.

Charles M. Johnson, Don Rose, Obed K. Price, and John H. Scott, all of Pittsburgh, Pa., for plaintiff in error.

Frank H. Kennedy and C. K. Robinson, both of Pittsburgh, Pa., for defendant in error.

Before GRAY, BUFFINGTON, and McPHERSON, Circuit Judges.

J. B. McPHERSON, Circuit Judge. [1] In this action the plaintiff, Annie Myers, seeks to recover damages from the Pittsburgh Coal Company for the death of her husband. For several months at least he had been employed as a "snapper," or brakeman, in underground operations, and at the time of his death he was taking part in the movement of empty cars from one point to another in a mine belonging to the defendant. The fact of a servant's death raises no presumption of his master's negligence. Such negligence must be shown affirmatively, and must be shown also to be the proximate cause of the death. In our opinion the present case is fatally defective in both these essentials, and for this reason the verdict in the plaintiff's favor cannot be sustained.

[2] What is known about the accident will appear in the following summary: On September 20, 1910, a train of more than 30 empty coal-cars, each of two tons' capacity, was drawn into the mine upon the main track by an electric motor. As the train approached a junction from which a sidetrack led off into one of the galleries or traveling-ways, the motor executed the maneuver known as a "flying switch"; that is, the motor increased its speed, separated from the cars, and continued to run upon the main track past the junction, while the switch at that point was quickly opened and the cars left the main track and ran into the siding by their own momentum at a diminishing rate of speed—on this occasion, not much, if any, faster than a walk. While they were thus moving the motor ran back, followed the cars into the siding, and finally overtook them several hundred yards beyond

the mouth of the mine. But, a short distance before it overtook them, the motor ran over something on the rail, and this was afterwards found to be the body of the deceased. When the cars left the junction and started down the siding, he was alive, on, or inside, the rear car, and a driver's lamp (giving more light than a miner's lamp) was burning in his cap. The cap, with the lamp upright and still burning, was found upon the floor of the gallery by the side of the track near the point where the body lay. In the immediate neighborhood was a second switch leading to No. 9 face, one of the mine workings where some of the cars were to be placed, and in aid of this movement it would have been his duty to turn the switch. Here also the trolley wire crossed the gallery from the left side to the right at a height of about five feet eight inches above the rails. A man standing on a passing car would not clear it. The wire was copper and of ordinary construction. Whether it was carrying a current depended on the position of an automatic device situated about 150 feet down the siding from the main track. After the motor (running alone) had entered the siding and had passed this device, the motorman found that the current had ceased, and thereupon he stopped, descended, went back, and adjusted the device, so that the current began again to flow. The strength of the current was about 500 volts, and this will certainly produce a severe shock, although in a given instance it may or may not be strong enough to kill. There was no stationary light at the second switch leading into No. 9 face, and the headlight of the motor, owing to ineffective carbons, was not burning except by intermittent flashes. The motorman had a lamp in his cap, but he was on the rear of the motor, and the lamp did not light the track in front. It was too dark to see ahead, and the body on the track was not observed until after it had been crushed by the front end of the motor. The deceased was a young man in good health, was accustomed to the work of a brakeman, had helped to put up the wires for the electric traction system, and had passed along this gallery perhaps 10 times a day for several months. He had often got off at the second switch, and turned it so that cars could pass through. On this occasion he was in the rear car, or on the bumper, as the train moved into the siding, and his waving light was seen by the motorman after the motor had passed the automatic device, and just before the motorman went back to adjust it. The waving light was the proper signal for the motor to advance and overtake the cars. The delay at the automatic device was probably two or three minutes. The motor—a heavy machine weighing 13 tons—was moving slowly, and could have been stopped within its own length, if the need to stop it had been known.

These are the facts, and we think it must be evident that they are consistent with more than one explanation of the deplorable event, with so many, indeed, that in our opinion the cause of death can only be conjectured. For example, the deceased was well acquainted with the gallery and its equipment, and knew the dangers to which he would be exposed. What brought him from the car to the ground? Had he forgotten the wire, or miscalculated its position, and did he therefore continue too long in the dangerous attitude of standing on or in the

car, instead of sitting or stooping? And did he thereby expose himself to the risk of encountering the wire where it crossed the gallery? If so, was the current flowing when he reached the wire, or was it still shut off by the automatic device? Did the current kill him, or only render him helpless? Or was he swept off the car by the mechanical force of the contact? If alive when he fell, was he killed by the fall, or only injured, perhaps stunned, so as·to be unable to move? Was he seized with vertigo, or other sudden sickness, as even healthy men sometimes are, and did he fall from the car for that reason? Or did he lose his footing by some unexpected movement of the train? Did he voluntarily get off the car in order to be ready at the switch leading into No. 9 face, and afterwards stumble and fall upon the track? Or did he become bewildered in the dark, and mistakenly suppose himself to be in a place of safety? Evidently, these situations are all more or less probable, and without some evidence that will indicate with reasonable accuracy to which of them his death is to be attributed we are in no position to consider the questions on which the case was made to turn at the trial,. namely, what bearing, if any, the position of the wire, or. the absence of a fixed light at the second switch, or the ineffective headlight on the motor, may have had on the event. And, of course, the still more distant question does not arise—upon whom the liability for the death should properly rest, whether upon the company itself·or upon the foreman in charge of the underground operations in the mine. Careful and repeated examination of the testimony has forced us to the conclusion that sufficient evidence was not offered to establish the company's negligence, and that the jury should not have been permitted to guess, for it·could be little more than a guess, what was the proximate cause of the death.

Authorities are scarcely needed to support the propositions that except in rare cases (of which this is not one) negligence cannot be inferred from the mere happening of an accident, and cannot be conjectured but must be proved. We may refer, however, to the following decisions: Patton v. Railway Co., 179 U. S. 663, 21 Sup. Ct. 275, 45 L. Ed.·361; Oil Co. v. Van Elderen, 137 Fed. 571, 70 C. C. A. 255; Clare v. Railroad, 167 Mass. 39, 44 N. E. 1054; Leary v. Railroad, 173 Mass. 373, 53 N. E. 817; .Warner v. Railroad, 178 Mo. 125, 77 S. W. 67; and the cases cited in 29 Cyc. 631, par. 2, note 52. In Patton v. Railway Co., the Supreme Court said:

"The fact of accident (to an employé) carries with it no presumption of negligence on the part of the employer, and it is an affirmative fact for the injured employé to establish that the employer has been guilty of negligence. * * * In the latter case it is not sufficient for the employé to show that the employer may have been guilty of negligence. The evidence must point to the fact that he was. And where the testimony leaves the matter uncertain, and shows that any one of half a dozen things may have brought about the injury, for some of which the employer is responsible and for some of which he is not, it is not for the jury to guess between these half a dozen causes and find that the negligence of the employer was the real cause, when there is no satisfactory foundation in the testimony for that conclusion. If the employé is unable to adduce sufficient evidence to show negligence on the part of the employer, it is only one of the many cases in which the plaintiff fails in his testimony, and no mere sympathy for the unfortunate victim of

an accident justifies any departure from settled rules of proof resting upon all plaintiffs."

And the Supreme Court of Pennsylvania is in full accord with these views. Alexander v. Water Co., 201 Pa. 256, 257, 50 Atl. 991; Marsh v. Railroad, 206 Pa. 560, 56 Atl. 52; Zeigler v. Simplex Co., 228 Pa. 67, 77 Atl. 239.

The judgment is reversed.