### PERKINS v. NORTHERN PAC. RY. CO.

(Circuit Court of Appeals, Ninth Circuit.   October 7, 1912.)

#### No. 2,081.

1. JUDGMENT (§ 199*)—NON OBSTANTE VEREDICTO—REVIEW OF EVIDENCE.

On a motion for judgment for defendant non obstante veredicto, the court has no right to weigh the evidence, but is bound to take the most favorable view for plaintiff of the evidence introduced on her behalf, and of all inferences that could be reasonably drawn therefrom by reasonable men, to the exclusion of the evidence on defendant's behalf, and deny the motion if the evidence so considered is sufficient to sustain a verdict.

[Ed. Note.—For other cases, see Judgment, Cent. Dig. §§ 367–375; Dec. Dig. § 199.*]

2. MASTER AND SERVANT (§ 278*)—DEATH OF SERVANT—CAUSE—NEGLIGENCE —EVIDENCE.

The cause of death of plaintiff's intestate, a railroad engineer, *held* not speculative or open to conjecture under the evidence, but the evidence was sufficient to sustain a verdict finding that the same was caused by decedent's head coming in contact with an upright timber of a bridge located too close to the track while he was leaning out of the gangway between the engine and the cab in the course of his duty made necessary because of the railroad company's negligence in failing to have the tender properly equipped with power brakes.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 954–972, 977; Dec. Dig. § 278.*]

In Error to the Circuit Court of the United States for the Eastern Division of the Eastern District of Washington.

Action by Nellie Perkins against the Northern Pacific Railway Company.   From a judgment for defendant non obstante veredicto (193 Fed. 219), plaintiff brings error.   Reversed.

This was an action brought by the surviving widow and sole heir of H. C. Perkins, deceased, for the recovery of damages sustained by the alleged negligent killing of her husband by the defendant in error, defendant also in the court below.   The complaint upon which the case was tried alleged, among other things, that H. C. Perkins at the time in question was a locomotive engineer in the service of the defendant company, and on the 28th of March, 1908, was with the other members of a train crew ordered to take an engine from Spokane, Wash., and assist certain trains over Kendrick Mountain, between the towns of Kendrick and Howell in the state of Idaho; that the tender of the engine was not equipped in accordance with the Safety Appliance Act of Congress in that the power-driven brakes on the tender were connected im-

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

properly and would not work; that to run the engine down the mountain it was necessary to have braking power on the tender in order to relieve the brakes on the driving-wheels of the engine so that the latter would not become heated and thereby incapacitated; that accordingly a hand brake was rigged up on the tender of the engine at Troy, Idaho, and that on the next day, March 29th, while taking the engine and tender down the mountain, the decedent, in performance of his duty, was compelled to leave his position of safety in the engine cab, and go to the tender for the purpose of operating the hand brake; that, after tightening the brake, decedent leaned out of the gangway in order to look out and down at the wheels as was his duty to do to ascertain whether the brakes were or were not acting properly; that while so doing his head was struck by an upright timber of bridge No. 182 of the railway company, resulting in his instant death; that the engine in question, which was No. 58, was an exceptionally large one, and that the bridge mentioned was too narrow for the proper operation of the road; that the defendant was a common carrier engaged in interstate commerce, and that the engine in question was so used by it in such commerce; that the death of Perkins was caused solely by the negligence of the defendant company in failing to provide necessary and proper machinery, appliances, etc., particularly in failing to provide brakes upon the tender and in maintaining such narrow bridge.

By its answer the defendant company admitted that it was a common carrier engaged in interstate commerce by means of its railroad, and admitted the employment and death of Perkins, and that the engine in question prior to the accident was used in interstate commerce, but denied that it was so used at the time of the accident because it was "running empty"; and the answer also interposed the defenses of assumption of risk and contributory negligence of decedent.

The trial, which was with a jury, resulted in a verdict in favor of the plaintiff for $20,000, upon which verdict judgment was rendered on the 27th day of May, 1911, in favor of the plaintiff for that sum, with costs. Subsequently the defendant company moved the court for judgment in its favor notwithstanding the verdict, and for a new trial, and on November 1, 1911, the trial judge filed an opinion in the case, directing a judgment for the defendant company non obstante veredicto, in pursuance of which the judgment theretofore entered in favor of the plaintiff was vacated and judgment given for the defendant, which latter judgment is brought here by the plaintiff below upon writ of error.

W. H. Plummer and Henry Jackson Darby, both of Spokane, Wash., for plaintiff in error.

Edward J. Cannon, George M. Ferris, and Charles E. Swan, all of Spokane, Wash., for defendant in error.

Before GILBERT and ROSS, Circuit Judges, and WOLVERTON, District Judge.

ROSS, Circuit Judge (after stating the facts as above). The record shows that upon the conclusion of the evidence for the plaintiff the defendant moved the court to take the case from the jury and dismiss it. In denying that motion the court said:

"I think there is testimony in this case tending to show the deceased met his death by coming in contact with the upright of that bridge. There is also testimony to show that the company was guilty of negligence in constructing and maintaining that upright so near to passing trains. I do not believe the doctrine of a presumption upon a presumption or speculation has application here. The testimony shows that, when last seen, he was tightening the hand brake within a very few yards of this bridge, and that his next duty would be to look down and see whether the brakes were tight, and within 10 seconds—10 or 15 seconds, at most—after he was last seen, he was struck by the bridge and killed."

The record further shows that upon the conclusion of the defendant's evidence counsel for the defendant said:

"The defendant having rested, and the plaintiff having rested, and the taking of the testimony having closed, the defendant again challenges the sufficiency of the evidence to sustain any verdict, and moves the court to direct a verdict in favor of the defendant."

After argument and in response to the motion last mentioned, the court said:

"I will deny the motion provisionally, with permission to the defendant to renew it after the case has been submitted."

And later:

"The Court: Then by agreement of counsel the motion for a judgment notwithstanding the verdict may be made later."

With its decision subsequently granting that motion, the court filed an opinion in which it said, among other things:

"For the purposes of this opinion, I will admit the sufficiency of the evidence to show that the air brakes on the tender were out of repair; that the bridge in question was too narrow; that the defendant was wanting in due care in both of these respects; and that the plaintiff is entitled to recover if either of these negligent acts was the direct or proximate cause of her husband's death. Nor do I deem it necessary at this time to discuss the question of proximate cause. It is tangible proof of the primary cause that is lacking here; for while the complaint is explicit as to the manner in which the deceased met his death, and as to the immediate cause of his death, there is no direct testimony tending to sustain these allegations. The brake wheel in question was located by the end of the tank, about the height of a man's head above the floor of the gangway. The deceased was last seen alive by his fireman at the brake wheel, tightening the hand brake. At that time the engine was 100 or 150 yards distant from the bridge, running at the rate of 10 miles per hour. After passing the bridge the engine gained in speed, and in looking to ascertain the cause the fireman discovered that the engineer was gone. The train was backed up to the bridge, and his dead body was found near the center of the bridge, outside of the rails, lying face downward, with the head turned under the left arm and the neck broken. When found there was a slight contusion on the right cheek. The tongue was out and blood was oozing from the mouth. A day or two later a witness for the plaintiff claims to have found 15 or 20 hairs on the upright of the bridge about six feet above the rails which resembled a lock of hair of the deceased submitted to him at the trial. This is all the direct testimony in the case."

After making a quotation from the testimony of one of the witnesses, the trial judge proceeded to say in his opinion:

"Before accepting the plaintiff's theory of the case, however, I must say that in my opinion her testimony shows that that theory is not only an improbable, but an impossible, one. According to the testimony offered on her behalf, the bridge in question is 14 feet 5 inches in the clear. The cab of the engine in passing through the bridge would come within less than a foot of the uprights. The tank is still wider than the engine, and the gangway is at least four or five feet above the rails. Making due allowance for the ordinary vibration or swaying of the engine while in motion, this would leave the cab and the tank at least twelve feet in width. The cab and the tank would therefore project almost four feet beyond the rails and the wheels, at a height of approximately three feet above the rails. This testimony demonstrates how utterly impossible it would be for a man to stand in the gangway of the engine and observe either the wheels or the brakes from the gangway. He could not even see the ends of the ties, much less the wheels or

the brake shoes. This is shown clearly and conclusively by the blue print offered in evidence by the defendant, the correctness of which is not challenged by the plaintiff. The view of the engine as there given is even more favorable to the plaintiff than her own testimony, for it shows the engine almost two feet narrower. A person standing in the gangway could not see either the wheels or the brakes without extending his person several feet beyond the cab. Indeed, such an undertaking would be utterly impossible. To observe the wheels or the brakes at all, the engineer would be compelled to descend to the bottom step shown on the exhibit, and even there he would have to peer under the tank. It is not claimed that he did this, nor is it conceivable that any prudent man would do so. Furthermore, it is strange, indeed, that a prudent and experienced railroad man would have to resort to such methods for the purpose of ascertaining whether his brakes were too tight or too loose. It would seem to the ordinary observer that he could and would determine that fact by the effect of the brakes on the momentum of his train. Again, if the upright of the bridge struck this man's head while his train was running at the rate of 10 miles per hour, we would expect to find some more convincing proof of the contact on his person. The contusion found on his head was far more likely to result from his face coming in contact with the floor of the bridge than from coming in contact with the upright of the bridge as claimed. Moreover, it is extremely improbable that his body would be found in the position in which it was found had he been struck as claimed. Of course, it is impossible to say what effect such a blow would have on his person, or in what position the body would be found after receiving the blow, but these matters are only referred to for the purpose of showing the inherent improbability that the theory of the case conceived by the plaintiff is the correct one. Giving to the plaintiff, however, the full benefit of all the testimony, there is no proof whatever that the deceased did in fact stand in the gangway or look out for the purpose of observing the condition of his brakes, or for any purpose whatsoever. The whole case rests upon conjecture, guesswork, and speculation, and the cause of death is a mystery which the verdict of the jury does not solve."

[1] As will be readily seen, the court below rendered its final decision upon the ground that the manner in which Perkins came to his death was purely conjectural, and reached that conclusion by contrasting and weighing the evidence on behalf of the respective parties. In passing upon the motion which gave rise to the judgment complained of, the court below had no right to weigh the evidence that had been given in the case and determine on which side it preponderated; on the contrary, it was bound to take the most favorable view for the plaintiff of the evidence introduced on her behalf, and of all inferences that could be reasonably drawn therefrom by reasonable men, to the exclusion of the evidence on behalf of the defendant. Mt. Adams, etc., Railway Co. v. Lowery, 74 Fed. 463, 20 C. C. A. 596; Felton v. Spiro, 78 Fed. 576, 24 C. C. A. 321; Jenkins & Reynolds Co. v. Alpene Portland Cement Co., 147 Fed. 641, 77 C. C. A. 625, and numerous cases there cited. See, also, McDermott v. Severe, 202 U. S. 600, 604, 26 Sup. Ct. 709, 50 L. Ed. 1162; Texas & Pacific Railway Co. v. Cox, 145 U. S. 593, 12 Sup. Ct. 905, 36 L. Ed. 829; Rochford v. Pennsylvania Co., 174 Fed. 81, 98 C. C. A. 105; Winters v. Baltimore & O. R. R. Co., 177 Fed. 44, 100 C. C. A. 462.

[2] Turning to the record, we find that there was evidence given on the trial on the part of the plaintiff tending to show that the deceased at the time of his death was 26 years of age, in perfect health, was 6 feet in height, and weighed about 200 pounds; that he was a man of good moral habits, very careful and cautious, and attended

strictly to his business; that on the 27th of March, 1908, a train crew of which Perkins was the locomotive engineer—his engine at the time being No. 58—left Spokane, Wash., for Kendrick, Idaho, and remained there that night; that the next day they made three trips down the mountain with the engine preceding its tender, and made the same number of trips on the 29th of March in the same manner; that they then received orders to back down the mountain as far as Clyde's Spur and pick up an "outfit train" with engine No. 340; that engine No. 58 was larger than the other engines run on that part of the defendant company's system, and that bridge 182 was narrower than any of its other bridges, and was more than 2 feet narrower than bridges 180 and 181; that bridge 182, where the accident happened, was a one-truss bridge built of wood, the truss being 15 feet in length and standing about 5 feet above the rails; that one Hines was Perkins' fireman at the time, and that one Kenjoski was the head brakeman of the crew, and that a man named Oldham took Perkins' place as engineer upon his death. Hines testified that he had crossed bridge 182 hundreds of times, and that engine 58 cleared the truss by "less than a foot;" and Kenjoski's testimony was that in backing down west at the time of the accident the engine was moving at the rate of about 10 miles an hour with a grade of about 2 per cent., and that in going through bridge 182 engine 58 cleared the uprights on the side from a foot to eight inches. The last-mentioned witness also testified that an engine while in motion would sway from three inches to a foot. There was also evidence given on the part of the plaintiff tending to show that the air brakes on the tender of engine 58 were connected improperly, in consequence of which there was no braking power so far as the tender was concerned, and that that was discovered after the crew left Spokane; that Perkins and Hines undertook to connect the brakes properly but were unable to do so, and that at Troy, Idaho, while waiting for further orders, Hines was instructed by Perkins to get a wheel and rig up a hand brake, which was done about an hour and a half before Perkins' death; that a hand brake is put on a tender as an auxiliary to the power brakes. Hines also testified in respect to the necessity for a brake on the tender as follows:

"There was too much strain on the drivers, the driving wheels of the engine—to hold the engine by the driving-brakes (while) running down the mountain. Q. You say there would have been too much strain on the driving-wheels? A. Too much strain on them; yes, sir."

Oldham, the engineer who took Perkins' place upon his death, also testified that braking power on a tender is necessary because otherwise the tires are liable to be heated and loosened, and that without the use of driver brakes it would be necessary to use a hand brake on the tender.

Hines, the fireman, further testified that he last saw Perkins alive when they were about 100 or 150 yards from bridge 182; that the engine was then backing down westerly towards it, moving at about 10 miles an hour, and that as the engine was backing going west the engineer was on the south side, and at the time was standing in the

gangway engaged in tightening the hand brake of the tender, which was located about one foot from the outer edge of the tank. Hines was also questioned and answered as follows:

"Q. What was the next duty (of the engineer) after tightening the brake? A. Why, it was to find out whether it had too much braking power or not enough.

"Q. And how was it necessary for the engineer to obtain this information? A. By looking at the tank brakes to see if the shoes were against the wheels.

"Q. In what position would he of necessity have to place himself in order to do that? A. He would have to lean out the gangway.

"Q. Go on. How is that? A. He would have to lean out the gangway to look down to see if they were holding.

"Q. Well, stand on the platform there and assume that you are backing down this way, or that way, that you are standing there in the gangway; just describe to the court and jury how he would have to place himself in order to look down at the air brake shoes or the hand brake shoes, to ascertain whether or not they were holding or were too tight or too loose? A. Well, we were backing down west, the tank was going west first and the cab was following, and he stood tightening the hand brake on the tank, and then, in order to see if they were holding, he would have to lean out of the gangway.

"Q. Well, just lean out and show the court and jury how? A. Well, he leaned out the gangway like this, in this way [illustrating].

"Q. Could he see those brake shoes to ascertain whether or not they were holding too tight, or were too loose, in any other way? A. Well, he could, but he would have to be entirely out of the gangway.

"Q. In other words, he would be clear out? A. He would be hanging clean out. * * *

"Q. And, in order to observe these brake shoes as you have described, how far would Mr. Perkins have to lean out of the engine in order to do that, as compared with the distance between the engine and the bridge timbers? A. He would have to lean out between a foot and 18 inches. He could not help it."

Oldham was also questioned and answered, among other things, as follows:

"Q. Now, in tightening the hand brakes on going down that mountain near bridge 182, just describe how that is done, what the engineer does and what is his duty to do? A. Why, he will tighten and set up the brakes, and then he has got to look out and see whether it is too tight or too loose.

"Q. Just describe how he looks out, what position he puts his foot in, and how far he has to lean out to find that out. * * * A. He leans out of the gangway, and that is about the only way he can see his tank brakes on those wide timbers. * * * Any ordinary man would have to reach out, to the best of my judgment, about from 16 to 20 inches in order to see the brakes on those wide timbers."

There was also testimony given to the effect that there were hand-holds on the tank and cab to take hold of in leaning out, one being on the tank and the other on the cab.

Hines, the fireman, testified that just shortly after they got on the curve after passing bridge 182, the engine commenced to pick up speed, and that he then remarked to Kenjoski, "What is the matter with that fellow that he don't slacken that engine up—we are going to go into the ditch;" that the engine kept on increasing speed, and that he looked over the boiler, and Perkins was not there, whereupon he stopped the engine and went back and found Perkins on the bridge with his neck broken, and with his feet in the direction in which the

train had been running; that is to say, to the west. He also testified that after the engine was stopped he found that the hand brake on the tender was set.

There was also given on the trial this testimony in respect to the condition of the body of the deceased, when the plaintiff was questioned and answered as follows:

"Q. I wish to ask one question that I had forgotten. I believe you stated that you saw the body of your husband when he was brought to Spokane, did you? A. I did.

"Q. The right side of his face, just describe that, Mrs. Perkins, just as to what you saw in the wound and in the face, if anything? A. Well, I saw it looked as if it was crushed right in there, and there were slivers all along the right side of his face, clear up into his hair a way.

"Q. You mean slivers of wood, I presume? A. Yes, sir; slivers."

And the witness Dunn testified, among other things:

"Q. Describe the right side of his face as near as you can to the court and jury, what condition was it in? A. There was a deep mark down the side of his face commencing as high up as his hair on his head, down his face across the corner of his mouth to the edge of his jaw, right through there into the jaw [indicating]. It looked though [as if] something had scraped his face clear back and broke the hide loose in several places."

Oldham also testified that the day after the accident by which Perkins lost his life, in going through bridge 182, he stopped and found adhering to the inside edge of one of the upright pieces at the entrance to the bridge, about 6 or 7 feet above its deck, about 20 or 30 hairs which he testified were of the same color as Perkins' hair, a lock of which was shown to the witness.

Surely there was here testimony tending to show, not only negligence on the part of the defendant company in not having the tender to its engine properly equipped with air brakes, and in maintaining a bridge too narrow for the proper operation of its road, but also tending to show that Perkins lost his life in the discharge of his duty while operating the defendant's engine. He was, according to the testimony of the fireman, last seen alive almost immediately before the engine reached the bridge, being then engaged in tightening the hand brake of the tender, immediately after which, according to the testimony, it was his duty to look and see whether the brake was properly set, the performance of which duty required him to lean out from the gang plank by means of the handholds on the cab and tank, thereby necessarily lowering his head and bringing it in contact with any intervening obstruction. There was testimony to the effect that the brake on the tender was found set almost immediately after the accident, and the law presumes that the deceased also performed his duty in looking to see that it was properly set. Texas & P. R. R. Co. v. Gentry, 163 U. S. 353, 366, 16 Sup. Ct. 1104, 41 L. Ed. 186; Baltimore, etc., R. R. Co. v. Landrigan, 191 U. S. 461, 474, 24 Sup. Ct. 137, 48 L. Ed. 262; Northern Pacific Railway Co. v. Spike, 121 Fed. 44, 57 C. C. A. 384; Adams v. Bunker Hill & S. Min. Co., 12 Idaho, 637, 89 Pac. 624, 11 L. R. A. (N. S.) 844; Burns v. Chicago, M. & St. P. R. R. Co., 69 Iowa, 450, 30 N. W. 25, 28, 58 Am. Rep. 227; Louisville & N. R. R. Co. v. Hahn's Adm'r, 135 Ky. 251, 122 S. W. 142; 9 Encyc. of Evidence, pp. 917, 918, 919, and cases there cited.

That the cause of an accident may be inferred from circumstances does not admit of doubt; and, as the testimony that has been herein set out must be taken as true in view of the verdict of the jury is it not a circumstance tending to show that Perkins was performing the duty of looking to see that the brake was properly set, when within a few seconds, or minutes at the longest, his dead body was found on the bridge over which the engine had just passed, and on the same side of the track that he rode, with his feet in the direction the engine was moving, with slivers of wood (of which material the uprights of the bridge were composed) in his face "clear up into his hair a way," and with his face looking as if, according to the testimony of one of the witnesses, it had been crushed in, and, according to that of another, as if "something had scraped his face clear back and broke the hide loose in several places"? And is it not a further circumstance tending to the same conclusion that the next day, according to the testimony of one of the witnesses, strands of hair were found in the edge of one of the upright pieces at the entrance of the bridge, similar to the hair of the deceased? Undoubtedly so. The case in truth was peculiarly one for the jury to determine whether or not the death of the deceased was occasioned by the alleged causes.

"Twelve men," said the Supreme Court in Railroad Company v. Stout, 17 Wall. 657, 664 (21 L. Ed. 745), "of the average of the community, comprising men of education and men of little education, men of learning and men whose learning consists only in what they have themselves seen and heard, the merchant, the mechanic, the farmer, the laborer, these sit together, consult, apply their separate experience of the affairs of life to the facts proven, and draw a unanimous conclusion. This average judgment thus given it is the great effort of the law to obtain. It is assumed that 12 men know more of the common affairs of life than does one man, that they can draw wiser and safer conclusions from admitted facts occurring than can a single judge. In no class of cases can this practical experience be more wisely applied than in that we are considering. We find, accordingly, although not uniform or harmonious, that the authorities justify us in holding in the case before us, that although the facts are undisputed it is for the jury, and not for the judge, to determine whether proper care was given, or whether they establish negligence."

It results that the action of the court below in granting the motion for judgment notwithstanding the verdict was erroneous and must be and hereby is reversed, with costs to the plaintiff in error, leaving the judgment entered upon the verdict in full force.