WEST v. CHICAGO, B. & Q. RY. CO.

(Circuit Court of Appeals, Seventh Circuit. April 19, 1910. Rehearing Denied June 10, 1910.)

No. 1,583.

1. MASTER AND SERVANT (§ 286*)—MASTER'S LIABILITY FOR INJURY TO SERVANT—LOW BRIDGE OVER RAILROAD.

In an action against a railroad company to recover for the death of a brakeman on a freight train who was killed in the night while on top of the cars in the course of his duty by his head striking an overhead bridge, proof that the clearance between the rails and such bridge was more than two feet less than the standard or usual clearance maintained by the company in case of such permanent overhead structures made a prima facie case of negligence against the defendant, which could only be met by proof of a necessity which could not reasonably be avoided, and which was not conclusively overcome by evidence that the bridge was for a highway crossing, and that when it was rebuilt some time before the highway commissioners objected to its being raised because of the steepness of the approaches, it not being shown that such objection could not have been overcome by also raising the approaches nor that it was impracticable to do so.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 1010–1050; Dec. Dig. § 286.*]

2. MASTER AND SERVANT (§ 286*)—ACTION FOR INJURY TO SERVANT—QUESTIONS FOR JURY.

Where there was direct and positive testimony of apparently disinterested and reputable witnesses that "telltales" to give warning of the approach to the bridge, which had been taken down six weeks before, had not been replaced at the time of the injury, although contradicted, the question was one for the jury.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 1010–1050; Dec. Dig. § 286.*]

3. MASTER AND SERVANT (§ 217*)—ASSUMPTION OF RISK—RAILROAD BRAKEMAN—LOW BRIDGE.

To charge a railroad brakeman with assumption of the risk of injury from a low overhead bridge, by which he was struck and killed, it must be shown that he had either actual or constructive notice, not only of the existence of the bridge, but of the fact that it was so low as to be dangerous, and also that the circumstances at the time of the injury were such as not to excuse a reasonably prudent person from having the memory of the peril within the immediate field of his consciousness.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 574–600; Dec. Dig. § 217.*

Assumption of risk incident to employment, see note to Chesapeake & O. R. Co. v. Hennessey, 38 C. C. A. 314.]

4. MASTER AND SERVANT (§§ 113, 288*)—ASSUMPTION OF RISK—RAILROAD BRAKEMAN—LOW BRIDGE.

The maintaining by a railroad company of an overhead bridge so low that it will strike a brakeman when standing or walking on the top of passing freight cars in the course of his duty, unless reasonably unavoidable, is negligence per se, and the company cannot charge its brakemen with assumption of the risk as matter of law by publishing rules giving them notice generally that bridges will not clear a man on top of high cars and to look out and guard themselves accordingly.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 224–227, 1068–1088; Dec. Dig. §§ 113, 288.*]

5. MASTER AND SERVANT (§ 288*)—ASSUMPTION OF RISK—RAILROAD BRAKEMAN.

The posting of a notice on a bulletin board by a railroad company that the "telltales" were down at a certain overhead bridge cannot charge a brakeman with assumption of the risk therefrom as a matter of law in the absence of evidence that he had actual notice or knowledge.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 1068–1088; Dec. Dig. § 288.*]

6. MASTER AND SERVANT (§ 289*)—INJURY OF RAILROAD BRAKEMAN BY LOW BRIDGE—CONTRIBUTORY NEGLIGENCE.

A brakeman on a freight train who was struck and killed by a low bridge at which there were no telltales, while proceeding along the tops of the cars in the night during a storm, held not chargeable with contributory negligence as matter· of law.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 1089–1132; Dec. Dig. § 289.*]

7. WORDS AND PHRASES—"TELLTALES."

"Telltales" are ropes suspended from a wire across the track to give warning of a low bridge.

Error to the Circuit Court of the United States for the Southern District of Illinois.

Action by Stella F. West, administratrix of the estate of Henry W. West, deceased, against the Chicago, Burlington & Quincy Railway Company. Judgment for defendant, and plaintiff brings error. Reversed.

E. J. King, for plaintiff in error.

Chas. V. Miles, for defendant in error.

Before GROSSCUP, BAKER, and SEAMAN, Circuit Judges.

BAKER, Circuit Judge. The action was for damages on account of the company's alleged wrongful causing of West's death. At the conclusion of the evidence the court directed a verdict for the company.

West, a freight brakeman on one of the company's trains, while passing on a stormy night from the engine back over the tops of the box cars to examine the hand brakes in the performance of his duty at the time, stepped from an ordinary box car to a furniture car, and there was struck on the back of the head by the girder of an overhead bridge and killed.

Negligence was charged in the lack of sufficient clearance and also of "telltales" (ropes suspended from a wire across the track) to give warning of the low bridge.

Evidence is in the record tending to prove that the bottom of the girder was 19 feet 8½ inches above the rails; that ordinary box cars are 12 feet high; that the furniture car in question was 14 feet 1 inch; that West was 6 feet tall in his shoes; that the company maintained this bridge as an overhead highway crossing; and that the company had a standard or usual clearance of 22 feet between track and permanent overhead structures. This was sufficient to make a prima facie case under the first charge of wrongful conduct. The ways of these great roads of commerce are maintained for the indefinite future.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

To erect permanent structures in such locations and relations that employés when discharging their duties are likely to be killed indicates an almost wanton disregard of human life. Under its denial the company did not conclusively overcome the prima facie showing. Such a death trap is not to be excused except by a necessity that cannot reasonably be avoided. The bridge foreman testified that when an old bridge at this location was replaced by the present one it was the intention to raise the new bridge, but the commissioners objected because the grade of the approaches would be too steep. There was no proof that the commissioners objected to the raising of the bridge if the company would also raise the approaches, nor what the cost of filling the approaches would be. A civil engineer testified that the track was upgrade both ways from the bridge and that while the clearance could be made sufficient by lowering the track "the grade would have to be carried out so far I should say it would be impracticable." Physical practicability was thus admitted; and, there being no evidence of how far the grade would have to be extended nor of the cost, the jury were not bound to accept an unsupported opinion that the change was financially impracticable. There was no proof to establish conclusively that the expense was beyond what a master of ordinary prudence would incur, first, out of regard for the safety of his employés; and, second, to save the damages that would accrue throughout the existence of the death trap in all cases where assumption of risk or contributory negligence could not successfully be used in defense.

For about six weeks before the accident the telltales were down. Six witnesses, mainly farmers residing near this highway crossing, testified that the telltales were not put up until after West was struck. The bridge crew and the section men, 14 in all, testified that the telltales were restored the second day before the injury. Furthermore, records of the work done by the bridge crew and telegraph messages sent over the company's wires from the bridge boss to his superintendent telling the daily whereabouts of the crew, were introduced. These corroborated the men's testimony. Thereon counsel for the company insist that the evidence of the plaintiff was so slight in comparison with that of the company that the court was justified in directing the verdict. The records and messages were at all times in the custody of the company's men who would naturally have an interest in freeing themselves and the company from blame. And while there was no direct attempt to impeach the company's men and records, the ultimate fact was squarely contradicted by the positive and circumstantial testimony of apparently disinterested men whose reputation for truthfulness was unassailed. Although from our study of the record the company's evidence appears much the stronger, we are of the opinion that this question of fact, involving the reliability of the evidence offered pro and con, should have been submitted to the jury, if the case was otherwise submissible.

With evidence sufficient to go to the jury upon the questions of the company's negligence respecting clearance and telltales, it was incumbent upon the company, in order to warrant a directed verdict, to establish affirmatively and conclusively either that West had assumed the risks or that he negligently contributed to his injury.

Assumption of risk of injury by the low bridge: From the teaching in Hough v. Rld. Co., 100 U. S. 213, 25 L. Ed. 612, that a railroad company's negligence in building and maintaining its tracks and appurtenant structures "is not a hazard usually or necessarily attendant upon the business" nor one "which the servant, in legal contemplation, is presumed to risk" it is apparent that West, by the act of entering the service, did not agree to take upon himself the danger of the negligent lack of clearance. When, if ever, did he assume the risk?

West, 25 years old, had had 4 years' experience as a brakeman. For 2 years he had worked on this division. During several months preceding his death the trains on which he worked had passed under this bridge about 20 times a month. The fatal occasion was in the middle of the night. How often the trains on which he worked passed under this bridge in the daylight was not shown. If it might be inferred that some of his trains passed in daytime, still there was no evidence that he was ever in a position on the trains where he could see the bridge. If it might be inferred that he had noticed the bridge, that would be far from establishing that he had ever apprehended the danger arising from its presence. The record contains no evidence that any one had informed him of the particular danger, nor any statement or admission that he knew of it. The knowledge, actual or constructive, that must have been brought home to West was not merely knowledge that there was an overhead bridge in this locality, but knowledge of the danger that would arise at the instant when a tall man standing erect on a high car in a moving train was about to pass under the bridge. Rld. Co. v. McDade, 191 U. S. 64, 24 Sup. Ct. 24, 48 L. Ed. 96; Ry. Co. v. Swearingen, 196 U. S. 51, 25 Sup. Ct. 164, 49 L. Ed. 382; Hawley v. Ry. Co., 133 Fed. 150, 66 C. C. A. 216; Ry. Co. v. Beckett, 163 Fed. 479, 90 C. C. A. 25; Ry. Co. v. Cowley, 166 Fed. 283, 92 C. C. A. 201.

As bearing on the question of West's knowledge of the danger arising from this low bridge, a time table was introduced which bore this print:

"Every man in the employ of the company that is in the train and engine service should have a copy of these time-table rules on hand. * * * Overhead bridges will not clear a man standing on top of high cars. Employés must look out for and guard themselves accordingly."

If this rule is to be construed as a notice that the company had been and intended to continue to be negligent in the construction of overhead bridges, and as a requirement that employés, without having any particular defect called to their attention, should hunt for and at their peril find all the defects, the rule is void as being an attempted abandonment of the company's duty and an attempted destruction of the employés' right to rely upon the belief that the company's duty has been faithfully performed until notice of failure in some particular is brought home to them—void as against public policy—just as void as the efforts in bills of lading to compel shippers to assume the carrier's negligence in transportation. As an attempted notice of the particular danger at this particular place, the rule manifestly falls short. And there was no direct proof that West had knowledge of the rule. If it

might be inferred from the company's custom of furnishing its brakemen with copies of the time tables that West had been provided with a copy, the inference is not conclusive.

But, concerning permanent obstructions (the maintenance of which, unless reasonably unavoidable, is negligence per se), we think a further principle is involved, namely, that in law an employé is not bound at his peril to keep his consciousness continually charged with memories of the locations and relations of such obstacles, and that his engrossment in his duties at the time may excuse his failure to recall the impending peril. Shearman & Redfield on Negligence (4th Ed.) § 198; Dorsey v. Construction Co., 42 Wis. 583. So, assumption of risk being a matter of defense, it would be necessary for the company to establish not merely that West at some former time had apprehended the danger, but also that the circumstances at the time of the injury were such as not to excuse a reasonably prudent person from having the memory of the peril within the immediate field of his consciousness.

Assumption of risk from the absence of telltales: On this, the record contains the further evidence that a written notice that the telltales were down was posted on a bulletin board, and that the matter was a frequent topic of conversation among the trainmen. But there was no direct proof that West had knowledge either of the written notice or of the talk. If knowledge might be inferred, it would not be the only inference on that subject that would be warranted by a consideration of all the circumstances in the record.

We are not now saying, with respect to either the lack of clearance or of telltales, that 12 reasonable men, under proper instructions from the court, might not properly find that a prudent person, circumstanced as was West, would have known of the dangers before stepping on the high car and would either have kept off or gone ahead knowingly at his own risk. But as different inferences of ultimate facts were fairly deducible from the state of the evidence, the question of assumed risk should have been submitted to the jury.

Contributory negligence: During a storm in the night, while discharging an immediate duty, West was proceeding along the tops of the cars. We can find nothing in the circumstances on that occasion that would have compelled the jury to find as the only legally permissible finding of fact that any danger was so obvious and imminent that a reasonably prudent person would not have acted as West did.

The judgment is reversed, with the direction to grant a new trial.