## READING CO. v. GEARY. *

### No. 3048.

Circuit Court of Appeals, Fourth Circuit.

Jan. 21, 1931.

Rowland K. Adams and Eugene S. Williams, both of Baltimore, Md. (Paul S. Parsons and George P. Bagby, both of Baltimore, Md., on the brief), for appellant.

*Certiorari denied 51 S. Ct. 142, 75 L. Ed. ---.

Saul Praeger and Walter L. Clark, both of Baltimore, Md. (Roszel C. Thomsen, of Baltimore, Md., on the brief), for appellee.

Before PARKER and NORTHCOTT, Circuit Judges, and GLENN, District Judge.

GLENN, District Judge.

The plaintiff below (appellee here), who was a fireman employed by the defendant company, was severely injured when he was struck by a "low bridge" at a point near Brandon Station in Pennsylvania. The plaintiff brought suit under the Federal Employers' Liability Act (45 USCA §§ 51–59). In his complaint his charges of negligence were: (1) That the defendant failed to provide the plaintiff with a reasonably safe place to work; (2) that it required him to run his train under a low bridge with insufficient clearance; (3) that the defendant gave the plaintiff no sufficient warning of the danger of this bridge. The trial judge refused a motion of the defendant for a directed verdict, submitted the case to the jury, and charged them fully as to contributory negligence and assumption of risk. The jury found for the plaintiff in the sum of $23,500, and judgment was entered thereon. Appeal has been taken from this judgment.

The facts are recited as briefly as possible. At the time of Geary's injury, he was working on one of the appellant's freight trains going from Hagerstown, Md., to Rutherford, Pa. There were two engines hauling the train, the first being a Western Maryland engine operated by its trainmen, and the second being a Reading engine operated by engineman Motter and Geary, the appellee. This was an interstate train moving in part over the tracks of the Reading and in part over the tracks of the Western Maryland, and operated under a traffic agreement between the two companies.

The Brandon bridge, where the Plaintiff was injured, is known in railroad parlance as a "low bridge"; that is to say, it does not have sufficient overhead clearance for a man to pass under while standing on top of a car or on the tender of an engine. The bridge was a plain ordinary highway bridge, spanning the double track over which the defendant's train was being operated. The blueprint offered in evidence shows that the crossbeams of the bridge are 17 feet 9 inches above the rails. Below the crossbeams are "stringers" which run parallel with the tracks. These stringers extend below the crossbeams a distance of one foot, leaving a clearance of 16 feet 9 inches below. The top of the tender on Geary's engine was 11 feet 11 inches above the rails when not loaded, thus leaving a clearance of 4 feet 10 inches from the level of the tender to the lowest part of the bridge. Underneath each stringer there are a few bolts which extend down some 5 inches more. Geary is 5 feet 6½ inches in height. On the lower part of the bridge soot and smoke had accumulated for years.

At this point the tracks ran in a direction generally east and west. Telltales had been erected by the company 109 feet west of the bridge. These telltales consisted of iron poles outside the tracks and a cable hanging over the tracks. The cable supported a frame from which ropes were suspended, 5 or 6 inches apart. The frame was 8 feet long, and the telltales ropes were set in one inch from each end, and the total width over which they may warn the man below is 7 feet 10 inches. These dangling ropes, according to measurement made at one time, extended 21 inches to the left of the outside of the left rail, and 9 inches to the right of the right rail, going in an easterly direction. The gauge of the track is 5 feet 2 inches from outside edge to outside edge. The width of the tender on which Geary was working is 10 feet 2 inches, leaving a 30-inch overhang of the tender on each side of the track. Thus these particular telltales protected all but 9 inches on the left-hand side of the tender, but failed to protect 21 inches of the tender on the right-hand side, the side where the hook racks were and the side where Geary was working. Objection was made by the defendant to the introduction of this testimony as to measurements, but the objection was overruled by the trial judge. We think that he was correct in so ruling, for the reasons hereinafter set out. It is shown that the measurements were made about two and one-half years after the date when Geary was hurt. After suit had been brought, and, in fact, only about ten days before the trial, W. E. Geary (plaintiff's father) made these measurements with reference to the telltales. There was no showing that there had been any change in the telltales. It was brought out at the trial that the bridge itself had been raised, and this was clearly understood by everyone. The trial judge took the view that there was a prima facie showing of "permanence of condition," so to speak, and admitted the testimony. In this view he was strengthened, as his remarks show, by the consideration that it was clearly within the defendant's power to show any change of condition. We think that the trial judge exercised sound discretion in so ruling.

The testimony showed that the telltales were supported by two upright steel pipes set in concrete bases with guys on each side. Steel cables were used to support the actual frames, and the whole structure was one which would normally stay in the same position over a considerable period of time, furthermore the duty was on the railroad to maintain these structures, and they were therefore charged with constant knowledge of their condition. It is true that the sag of the cable or loosening of the guys might have caused a few inches variation in the actual hanging of the frames. In other words, the lower corners of the frame might have been hanging on day of measurement a few inches different from the way they hung in September, 1927. The judge clearly pointed out that the defendant could introduce testimony to show any such variations, if any existed. He further instructed the jury that, in considering the testimony of measurements made in March, 1930, they should take into consideration the lapse of time. He said: "The plaintiff's measurements were taken nearly two and one half years after the accident, on the other hand there is no testimony that the telltales have ever been changed."

The leading texts on evidence and a number of cases discuss at some length the question as to when belated measurements are admissible to show conditions existing at a time materially in advance of the date of measurements.

Of course, in the last analysis it depends upon the exercise of sound discretion by the trial judge in applying the general rule to the particular case. As is said in Green v. Ashland Water Co., 101 Wis. 258, 77 N. W. 722, 726, 43 L. R. A. 117, 70 Am. St. Rep. 911:

"True, evidence of a situation existing after an injury, though a considerable time may have elapsed, is admissible to show the situation existing at the time of the injury, if preceded by prima facie proof that no change has taken place in the meantime." We think that such a preliminary showing may consist of a showing as to materials used and common sense inferences drawn from the type of construction. Considering the steel and concrete construction here used, we think that such a showing was clearly made out in the case at bar. The cases cited by appellant which deal with brake rods and other instrumentalities which are subject to constant change would not control here. One of the cited cases refers to the condition of a railroad track itself. When we consider that a track is subjected to heavy daily use and that it rests upon wooden cross-ties which in turn rest upon the ground, such a strong presumption of "permanence of condition" cannot arise as to the condition of the track itself. There are too many variable elements to be considered in the case of the track. Ballast, if used, is constantly being replenished, ties are changed at frequent intervals, and section gangs are constantly at work altering the exact alignment of tracks. We do not think, therefore, that the cases dealing with track conditions control here. Without going into an extended discussion of this matter, we think that the trial judge properly exercised his discretion in admitting the testimony. He had in mind the rule as stated in Chamberlayne Modern Law of Evidence, vol. 2, §§ 1030–1033, both inclusive. "The established rule is that the Court will infer that a particular fact or set of facts continues to exist as long as such facts usually, as a matter of experience, have been found so to continue" and in same connection we find the following statement in section 1033: "The more impermanent the fact or state of affairs, the shorter will be the time during which it will be assumed to continue. Per contra, the more enduring the nature of the situation shown to exist, the longer will it be taken to maintain its present condition."

In discussing the admissibility of evidence of the existence of a certain condition of a structure at a given time to show its prior or subsequent existence, Mr. Wigmore gives many interesting illustrations and quotes from the opinions of many distinguished jurists in support of this declaration by him: "This general principle that a prior or subsequent existence is evidential of a later or earlier one has been repeatedly laid down, and has even been spoken of as a presumption." 1 Wigmore on Evidence (2d Ed.) 772.

The testimony as to the exact situation which obtained at the time Geary was injured shows that he was in a place where one of the most important of his duties required him to be. After all, he was a fireman, and his main duty was to control the burning of the coal in the fire box. The automatic stokers, such as the one on Geary's engine, have diminished to a great degree the physical labor which firemen formerly had to perform. But, to keep the fire burning evenly and regularly, the fireman is required to use long steel rods, which are commonly called hooks, the longest one of which was fifteen feet in length. Obviously, these hooks when used in the fire box became red hot, and can therefore only be

handled from one end. On the morning of the accident, Geary had been firing his engine coming up Guilford Hill, the top of which is three or four miles west of Brandon bridge, and continued to fire the engine for a short distance down the hill. In this work he was using several hooks to stir the fire. When he finished with his fire, it was his duty to place the hooks back in the hook racks, which are along the right side of the tender, straight back of the engineman's cab. He had pulled his hooks out of the fire, one of which was fifteen feet long and red hot, and placed them on top of the coal, preparatory to putting them in the racks. The coal had been piled higher than the level of the tender in the middle, and sloped down to a level with the tender on the sides. He then climbed up on the coal, and, while in a stooping position, began to clean the coal from around the hook racks with his hands. He had placed one of the hooks in the racks, and was evidently working on the other two when he was hit. The long fifteen-foot hook was found after the accident lying back on the coal, four or five inches from the hook rack, parallel with the side of the tender. It was still hot. In further support of the most reasonable view as to the way the injury was actually received is Geary's own testimony. He testified that he was as close to the right-hand side of the tender as he could get, and that he was never warned by the telltales. Motter, the engineer, missed his fireman when they were under the bridge, and, looking out over the left side of the tender, saw Geary's foot sticking out on the left side of the tender. He ran up over the coal pile and saw Geary lying flat on his back with both arms stretched out, one foot out over the tank and the other foot in the other direction. When so found, he was still unconscious.

An examination of the bridge in the afternoon of the day of the accident showed a clear spot on the inside of the corner of the stringer that runs parallel with the track just above the line where the extreme right-hand side of the tender of Geary's engine had passed. This was evidently the place where Geary's head had struck the bridge.

There was a direct conflict in the testimony as to whether it was daylight or dark at the time of the accident. One witness said: "It was not light, it was a dewy morning and the smoke kind of rode with the train." The testimony shows that Geary had been over this part of the road many times prior to the accident. He testified that the time he was injured was the only time that he had ever passed under the bridge when he was not inside the cab. The defendant, in support of its plea of assumption of risk, proved that it had given Geary a copy of "special instructions" warning him of low bridges and other dangers on the road. He gave a receipt on June 12, 1927, in which he stated that he would examine time-table carefully, and would study and observe "special instructions." On this phase of the case Geary testified as follows on cross-examination:

"I received a copy of Western Maryland Time Table and read some of it. I never read the "special instructions," subheading "safety-first"—not that I know of. I do not know that there is anything of that sort in the copy I received. I never read the bulletins that were posted from time to time at the Hagerstown offices or the warnings or notices to employees, including firemen. I never signed for a bulletin board except on the P. and R. I don't know for sure where that bulletin board is located."

There was further testimony that certain signals were located on this bridge, and that Geary and his engineer had customarily "checked on each other" when approaching this signal. This phase of Geary's work, however, would not be as important when he was working on the second engine of a double header as it would when he was on a lone engine or on a lead engine. There was further testimony on the part of other engineers and firemen about standard equipment on the railroad. However that may be, it does seem to us that, where a railway company erects telltales which are safety devices and nothing else, they should be erected wide enough to be certain to warn a fireman working on the extreme right or the extreme left of the tender. The hook racks are put on the extreme right. The fireman, in the performance of his duties, must place these hooks in their proper rack, and to do so he must work for a considerable time right over these racks. When working with these hooks, his attention is naturally diverted from the track ahead. To add to his difficulties in such a situation, there was on this occasion the smoke of the two engines rolling back over him. In such a situation the telltales should be adequate to warn him. As to whether or not they were adequate at the time and place involved was, under conflicting testimony, a question of fact for the jury.

There have been many cases arising out of injuries received by firemen and brakemen injured by "low bridges." Necessarily,

there have been facts which distinguish all of these cases in some way from each other. Mr. Justice Day, in the case of Choctaw, O. & G. R. Co. v. McDade, 191 U. S. 64, 24 S. Ct. 24, 25, 48 L. Ed. 96, explains the sound reason which holds the railroad company to be negligent for constructing appliances or bridges so close to the track as to make it dangerous for the brakeman or fireman. The McDade Case was a waterspout case, and Mr. Justice Day, with reference to the construction of the waterspout, said:

"We agree with the circuit court of appeals in affirming the instructions upon this subject given by Judge Hammond to the jury, in which he said: 'It is so simple a task, one so devoid of all exigencies of expense, necessity, or convenience, so free of any consideration of skill, except that of the foot rule, and so entirely destitute of any element of choice or selection, that not to make such a construction safe for the brakemen on the trains is a conviction of negligence.'"

The doctrine of this case was adopted and applied by this court in the cases of Norfolk & W. Ry. Co. v. Beckett, 163 F. 479, and Chesapeake & O. Ry. Co. v. Cowley, 166 F. 283.

In the case of West v. Chicago, B. & Q. Ry. Co. (C. C. A.) 179 F. 801, 802, the court said:

"Evidence is in the record tending to prove that the bottom of the girder was 19 feet, 8½ inches above the rails; that ordinary box cars are 12 feet high; that the furniture car in question was 14 feet 1 inch; that West was 6 feet tall in his shoes; that the company maintained this bridge as an overhead highway crossing; and that the company had a standard or usual clearance of 22 feet between track and permanent overhead structures. This was sufficient to make a prima facie case under the first charge of wrongful conduct." West v. Chicago, B. & Q. Ry. Co. (C. C. A.) 179 F. 801, 802.

The West Case has been followed and applied in several cases. Among others, we find the same rule stated in two cases to which we see fit to refer.

"The action of the Railway Company, through its employees, in conducting its switching operations upon a switch obstructed, as this one was, in such manner as to endanger the lives of brakemen upon its cars, speaks so clearly of negligence that no time need be spent upon it." Kanawha & M. R. Co. v. Kerse, 239 U. S. 576, 36 S. Ct. 174, 60 L. Ed. 448.

Again we refer to the statement found in another "Low Bridge" case:

"Although, according to the evidence, this bridge was unusually low, and maintained, not by the defendant, but by the city of Lawrence, this did not entitle the defendant to the requested instructions that the railroad could not be held negligent with respect to its height. If the passage beneath it was not reasonably safe under all the circumstances, the railroad might still be negligent in continuing to permit the passage of trains beneath it while in such condition." Boston & M. R. Co. v. Brown (C. C. A.) 218 F. 625, 627.

Of course, the negligence of the maintenance of such a structure may be overcome by proper safeguards used by the company and proper warnings to the employees. The trial judge so understood and so instructed the jury. He said in the course of his charge:

"Such a bridge in and of itself raises a presumption of negligence, not a conclusive presumption of negligence, however, but one subject to being overcome if proper precautions are shown to have been taken to warn the employees."

But, where a railroad attempts to relieve itself from the results of negligence of maintaining such a low bridge by use of a warning or safety device, this device must be adequate to warn all of the employees who in normal performance of their duties will run the risk of being injured. What Mr. Justice Day said of the waterspout applies with even greater force to telltales. Judge Hammond of the Circuit Court of Appeals had said in the same case: "It was so easy to remove the danger by simply having the water spout a little higher." If this be true of a waterspout, which is a necessary appliance, and constructed for a useful purpose, how much more should a telltale which has no other function than that of a warning device be properly constructed. So it seems that to fail to make such a simple device wide enough to warn a fireman working around the hook racks on the tender is a basis of actionable negligence, if shown to be the proximate cause of an injury.

Judge Coleman's instructions to the jury as to the effect of contributory negligence under the Federal Employers' Liability Act are so wholly in accord with the plain words of the statute and the cases construing it that we do not deem it necessary to enter into a discussion of this phase of the case. Indeed, the appellant concedes that the given instruc-

tions on this defense were correct. The only contention is that he should have charged the jury that the plaintiff was guilty of contributory negligence as a matter of law. We think that he properly left this question to the jury.

The appellant next contends that, by reason of Geary's experience as a fireman, and the fact that he had passed under the bridge many times, and also by reason of the fact that the defendant had given him a copy of "special instructions" warning him of low bridges on the road, the plaintiff assumed the risk, and therefore is not entitled to recover for his injury.

■■ It is well settled that, where one is employed as in this instance, he assumes the ordinary risks incident to the work in which he is engaged; but he does not assume such risks as may be due to the negligence of the defendant, its officers, agents or employees, unless the risks resulting from such negligence are so well known to the plaintiff or are so plainly observable that he may be presumed to know of them.

Geary testified that the trip on which he was injured was the only trip on which he had ever passed under this bridge when he was not inside the cab. We find that in a similar situation a court has expressed its view as follows:

"However often trains upon which he had acted as brakeman had been under the bridge, or however long he had worked as flagman near it, there was nothing to show that he had ever passed under it on the top of a freight car, or had his attention directed to the width of the guard." Boston & M. R. R. v. Brown (C. C. A.) 218 F. 625, 627.

Also in Butler v. Frazee, 211 U. S. 459, 29 S. Ct. 136, 138, 53 L. Ed. 281, Mr. Justice Moody said:

"Where the elements and combination out of which the danger arises are visible it cannot always be said that the danger itself is so apparent that the employee must be held, as matter of law, to understand, appreciate, and assume the risk of it."

We are called upon, therefore, to say whether or not the defense of assumption of risk was so made out that it was the duty of the trial judge as a matter of law to direct a verdict for the defendant. The law applicable thereto is well settled; the difficulty is to apply it properly to the facts of the particular case. In Davis v. Crane (C. C. A.) 12 F. (2d) 355, we find an admirable discussion of the law, with the leading cases cited and discussed. We cannot do better than refer to that opinion, for it deals with the cases which we have examined. The quotation from the opinion of the Supreme Court in Gila Valley, Globe & Northern Ry. Co. v. Hall, 232 U. S. 94, 101, 102, 34 S. Ct. 229, 231, 58 L. Ed. 521, seems especially pertinent here. It is:

"An employee assumes the risk of dangers normally incident to the occupation in which he voluntarily engages, so far as these are not attributable to the employer's negligence. But the employee has a right to assume that his employer has exercised proper care with respect to providing a safe place of work, and suitable and safe appliances for the work, and is not to be treated as assuming the risk arising from a defect that is attributable to the employer's negligence, until the employee becomes aware of such defect, or unless it is so plainly observable that he may be presumed to have known of it. Moreover, in order to charge an employee with the assumption of a risk attributable to a defect due to the employer's negligence, it must appear not only that he knew (or is presumed to have known) of the defect, but that he knew it endangered his safety; or else such danger must have been so obvious that an ordinarily prudent person, under the circumstances, would have appreciated it."

■ Applying the test of these well-established principles to the facts of the instant case, does it so strongly appear that the defense of assumption of risk was made out that the trial judge should have said as a matter of law that the plaintiff was barred from recovery by having assumed the risk? We think not. After careful examination and consideration of all the facts in the record, we have no difficulty in arriving at the conclusion that the learned trial judge properly submitted the question of assumption of risk to the jury.

■ The appellant contends that the case should have been withdrawn from the jury, for the reason the evidence did not sufficiently prove the exact way in which the injury was received. It is contended that the evidence did not show with sufficient certainty as to whether Geary was standing upright or stooping when he passed under the telltales. Furthermore, it is contended that Geary might have raised himself from a stooping to an upright position in the short time elapsing between the passage of the tender from the telltales to the bridge. Judge Coleman in his charge discussed the various theories advanced, and told the jury that they could not

resort to speculation. The Supreme Court very recently has set aside a verdict which in its opinion was based upon speculation. Atchison, Topeka & Santa Fé Ry. Co. v. Toops, Adm'x, 281 U. S. 351, 50 S. Ct. 281, 74 L. Ed. 896. In that case there was no testimony which substantially connects the negligence with the injury. The plaintiff there was relying upon a possible theory as to causal relation of negligence to injury. Here definite evidence supported the view which was undoubtedly taken by the jury.

While it was possible that the plaintiff straightened up between the telltale and the "low bridge," this was not the only explanation supported by the definite evidence as to where Geary was when he was struck. It only took the train three seconds to run this short distance—but, even if the accident happened in that way, this does not alter the fact that he was hit by a "low bridge." The view which is more strongly supported by the evidence is that both the "Low Bridge" and the inadequate telltale contributed proximately to the injury. The fact that the testimony is consistent with more than one view of the exact sequence of events which preceded the injury does not mean that a jury has resorted to speculation in founding its verdict upon either of the suggested theories as to the exact sequence of events. We think there is sufficient evidence here as to the causal relation between negligence and injury, whether Geary rose to an upright position the very second before he was hit or had been standing in such position for several minutes. Geary's own testimony tells how it happened, and it was within the province of the jury to believe his testimony, and they were not resorting to speculation to find that it happened as he said. He knew more about it than any one else. His testimony was supported by logical inferences from the testimony of other witnesses as to the facts and circumstances surrounding the accident itself.

The appellant finally assigns error on the part of the trial judge in referring to the possible aggravation of a pre-existent thyroid trouble and allowing the jury to consider this aggravation, if the evidence satisfied them that there was such aggravation, as an element of damage.

Several of the doctors testified that the plaintiff appeared to have had thyroid trouble before he received this injury. The plaintiff's parents both testified on the other hand that he had never evidenced or complained of thyroid trouble before that date. One of the doctors said that such a blow as the one

Geary had received would probably aggravate the thyroid trouble, if he already had it. It was agreed by all the doctors called as witnesses that people frequently have thyroid trouble for years before it becomes noticeable. It is well known that in certain sections of the country thyroid troubles are much more common than in others, and that the section where Geary lives is one where it is prevalent to a greater degree than in many others.

There was ample testimony in the case to call for the instruction given by the trial judge with reference to the possible aggravation of the thyroid trouble by the blow on the head.

For the foregoing reasons, the judgment of the trial court is affirmed.

Affirmed.