## KULP v. CHICAGO, ST. P., M. & O. RY. CO.*
### No. 10650.

Circuit Court of Appeals, Eighth Circuit.
Feb. 27, 1937.

Rehearing Denied March 22, 1937.

William H. DeParcq, of Minneapolis, Minn. (Robert J. McDonald, of Minneapolis, Minn., on the brief), for appellant.

Warren Newcome, of St. Paul, Minn. (Alfred E. Rietz, of St. Paul, Minn., and William T. Faricy, of Chicago, Ill., on the brief), for appellee.

Before STONE, SANBORN, and VAN VALKENBURGH, Circuit Judges.

VAN VALKENBURGH, Circuit Judge.

Appellant sues to recover damages for the death of Harry Rice Kulp, sustained while in the employ, as a freight brakeman, of appellee, Chicago, St. Paul, Minneapolis & Omaha Railway Company, generally referred to as the "Omaha." Herein the parties will be designated as in the trial court.

At about 8 p. m. July 19, 1933, defendant's extra freight train No. 394 left Mankato, Minn., eastbound for Minneapolis. Its route lay successively through the following points which will be hereinafter mentioned: Merriam Junction, Chaska, Chaska Hill, Eden Prairie, Hopkins,. Cedar Lake, and Lyndale bridge. The last named is at the entrance to final destination. The train at the outset was composed of forty-six cars, including a caboose. The crew consisted of conductor Helmer, engineer Martinson, fireman Aurelius, rear brakeman Bland, and head brakeman Kulp. ·At Merriam Junction six cars were cut out from the head-end, and the train proceeded with thirty-nine box cars and one flat car loaded with machinery, the latter next to the caboose. , From Merriam Junction the train was operated over the tracks of the Minneapolis & St. Louis Railway Company, hereinafter designated as the St. Louis Company. The track on which this train was moving is known throughout the record as the Eastbound Mainline track.

The Lyndale bridge is an overhead structure crossing the mainline tracks of the St. Louis Company in Minneapolis. To guard against injury to' trainmen while passing under this bridge, at a distance of 156 feet west of the westerly edge of the bridge, so-called telltales are placed. These telltales are composed of

*Writ of certiorari denied 57 S.Ct. 930, 81 L.Ed. ——

steel frames suspended from cables above both mainline tracks. These frames inclose a wire mesh, and from the bottom of the frames a number of ropes hang loose. Contact with these ropes, as the train passes, conveys warning to trainmen who may be on the tops of cars that the train is approaching the overhead structure. The steel frames are of sufficient weight to constitute a menace to the safety of any one upon a moving train who might come in contact with them, and they are normally carried so high that such contact is impossible.

On the night in question the telltale over this eastbound main track had sagged to such extent that the frames were dangerously low. When the train reached the East Minneapolis yards after passing under the Lyndale bridge, at about 2:35 a. m. on July 20th, head brakeman Kulp was missing. At 4:00 a. m. his severed body was found, partly between the rails of the eastbound main track and about 25 or 26 feet east of the Lyndale bridge. In his petition for recovery under the Federal Employer's Liability Act (45 U.S.C.A. §§ 51–59), the negligence alleged by the administrator is that the conductor and engineer had been advised of the dangerous condition of the telltale and had failed and neglected to warn the deceased, who came into contact with the sagging frames, and was thrown thereby from his position on the cars to his death beneath the wheels below.

At the conclusion of all the evidence, the trial court sustained the defendant's motion for a directed verdict, and entered judgment accordingly. The main issue involved is whether there was evidence sufficient to entitle submission to the jury. The contentions of the defendant may be considered under the following heads:

(1) No substantial evidence of negligence. The burden was on plaintiff to show by substantial evidence that Kulp was not notified of the dangerous condition of the telltale.

(2) No substantial evidence that failure to warn of the low telltale was the proximate cause of death. (a) No substantial evidence that Kulp was on top of the Omaha train when it passed under the telltale. (b) No substantial evidence that the telltale frame was low enough to strike Kulp if it be assumed he was on top of the train.

(3) The cause of death is therefore left in the realm of speculation and conjecture.

Analysis of these contentions unfortunately necessitates a somewhat extended consideration of the evidence.

1. It is conceded that from Mankato to Chaska Hill Kulp rode in the engine cab with the engineer and fireman. It is further undisputed that this was a proper place for the head brakeman to ride. At Chaska Hill—a very steep hill—Kulp left the engine. Engineer Martinson says: "He was on the engine until we got around the curve and then he dropped off because we came up the hill pretty hard and he thought there might be a brake sticking. Sometimes the air does not completely release and it will stick and pull hard and you have to release it. After I saw Kulp getting off the engine, I saw his lantern. He gave us the high-ball and got on the caboose. After leaving Chaska we went through Eden Prairie and Hopkins."

It is undisputed that this action of Kulp in releasing a sticking brake was incidental to a brakeman's duties, and that it was "usual and customary for the brakeman to get off the engine and get on the caboose while the train was in motion." Conductor Helmer was called by plaintiff for cross-examination under the statute, and testified thus: "I remember that at Chaska Hill one of the brakes in the train was sticking according to what Mr. Kulp said. Coming over the hill at Chaska, Mr. Kulp got on the caboose while the train was in motion. He said he had released the brake from sticking."

Helmer then says that he and Bland, the rear brakeman, were sitting in the caboose; at that time the train was moving at a rate of 5 or 10 miles an hour; after Chaska Hill the speed increased to 30 or 35 miles an hour, and varied within these limits; Kulp was in the caboose getting a drink of water; he remained in the caboose until the train arrived at Holden street and stopped for a period of four or five minutes, with the caboose about 200 feet west of the Lyndale bridge. Here, Helmer says, Kulp got out of the caboose and that he did not see him after that; it was then about 2:35 o'clock in the morning of July 20th; Bland, he says, went back to flag, gave the signal to go ahead, and caught the train while

it was in motion. Helmer further states that while Kulp was in the caboose at Hopkins a warning message was received from the train dispatcher of the St. Louis Company as follows: "Telltales down on south side of Lyndale Ave. Bridge will not clear man sitting or standing on top of train."

He continues: "Mr. Bland received it. At the time Mr. Bland, Mr. Kulp, and myself were in the caboose. Mr. Bland read it out loud. He handed it to Mr. Kulp who read it and he handed it back to Mr. Bland and Mr. Bland then handed it to me. I read it and placed it on a hook where we have to file it. Nothing was said about the order. No one said anything to me."

This warning order was sent out by the train dispatcher of the St. Louis Company, was received by the telegraph operator at Hopkins, and was delivered to both engine and caboose at 2:17 a. m. July 20th. Hopkins is within the St. Louis yard limits and is about 4½ miles west of the Lyndale bridge. This testimony, standing alone, would tend to indicate that Kulp received the warning when it was delivered, and that he remained in the caboose until the train arrived and stopped at Holden street, while the caboose was standing almost directly under the telltale, and at a point where contact with that telltale, as he proceeded toward the head of the train, would have been practically impossible. But this testimony does not stand alone. An investigation conducted jointly by the Omaha and the St. Louis Company was held on the afternoon of July 20th in Minneapolis, and Helmer made a written statement relative to this accident. This statement was produced by the superintendent of the Omaha, was admitted as Exhibit Y, and reads as follows:

"Q. Will you please state in your own way just what you know regarding this accident. A. Kulp dropped off on Chaska Hill to see a brake sticking and caught the caboose and got in caboose and said there was a brake sticking, took a drink of water, sat there a few minutes and started out and that was the last we saw of him until we got to East Minneapolis. We missed him at East Minneapolis and we didn't head in and I walked down and saw there were not switches lined up and I asked the engineer if Kulp was around and he said no. I lined up and got in the yard and I told Mr. Mealey over there we evidently lost him so he started over the top looking for him. I came around with the engine looked over the train finally looked on the wheels and found blood on the wheels. I went to the office and Mr. Mealey said he would call up the M. & St. L. dispatcher. When we got back to the West Side I called the dispatcher and he told me they found him at Lyndale Avenue.

"Q. Just where was the rear end of the train when brakeman Kulp left caboose to walk over head. A. On the hill, he was in the caboose very long and it was near the crossing on Chaska Hill.

"Q. Did you say anything to engineer Martinson with reference to Kulp leaving caboose on Chaska Hill. A. I don't know if he asked me or not but I told him the last I seen of him was on Chaska Hill.

"Q. What conversation did you have when he came back to caboose at Chaska. A. He said a brake was sticking, took a drink of water, sat down a few minutes and then went out.

"Q. You know that M. & St. L. rules require to show train order to front brakeman when practicable. A. Yes, sir.

"Q. In view of that fact don't you think at Hopkins you should have made certain that Kulp got the information. A. I probably should.

"Q. Did this train stop for stop board. A. I think he just slowed up and almost stopped.

"Q. You don't think he came to full stop. A. I don't think so.

"Q. Will you please state in the record why before leaving Hopkins you did not give train order information to front brakeman. A. I figured he was on head end and the head end would tell him.

"Q. You're sure that Kulp had lighted lantern when he left caboose. A. Yes, sir.

"Q. Are you satisfied this investigation is fair and impartial. A. Yes.

"I have read this statement and it is true.

"[Signed] F. L. Helmer."

Plaintiff's Exhibit Z is a telegraphic report of the same injury sent by Helmer to the general superintendent of the Omaha. In it are the following suggestive statements: Replying to a question as to

the nature of the accident, he replied: "Evidently was on top of train and was knocked off." At the close, under the heading "Remarks," the telegram concludes: "Dropped off on Chaska Hill seen fire flying. Caught caboose, and started over the top of train to head end." Signed "F. L. Helmer, Conductor." In the course of the cross-examination Helmer was confronted by these former statements in contradiction of his testimony at the trial. He then said that, shortly after he and rear brakeman Bland knew, or at least thought, that Kulp had been killed, they had an understanding as to the report they would make. They agreed that they would report to the company that they had not seen Kulp after they left Chaska Hill, which is 12 or 15 miles west of Hopkins; that he did this to protect his job, and made what he termed this false statement for that purpose. He evidently thought then that, if he had not seen Kulp since the warning was delivered to him at Hopkins, he could not be held responsible by the company for his failure to warn the head brakeman. In his original report he also stated that the train slowed up, but did not stop, at Holden street just before reaching Lyndale bridge.

Delmar E. Kulp, the plaintiff, testifies that, before the trial, he called upon Helmer, with his attorney Noonan, who quoted to Helmer the warning order to which reference has been made; that Helmer then said that the last time he had seen deceased was at Chaska Hill; and that deceased had never seen the warning order. Appellant further testifies that two days after the accident Helmer made the same statement to him, and said that the train did not stop at Holden street and was traveling at the rate of 5 or 10 miles per hour while passing under the Lyndale bridge. Another witness, McDonald, testifies that Helmer made these statements to him.

At the trial Engineer Martinson testified that the train stopped at Holden street just before passing under Lyndale bridge. On cross-examination it was shown that at the investigation held shortly after the accident Martinson stated that the train did not stop at Holden street. He testified at a former trial of this case that the train did not stop at Holden street. His explanation of this change of testimony is that the fireman, at the investigation hearing July 20, 1933, told him that he was mistaken, and that the train did stop at Holden street. Nevertheless, at another trial of this case in 1935, nearly two years later, he again testified that the train did not stop. In his cross-examination at this trial he makes this significant statement: "I didn't give very much thought to whether it was important as to whether the train stopped at Holden street so that the rear end would be near the telltales. I didn't ask them to change the answer at the investigation. I let it stand up to the present time and never asked them to change it at all."

Furthermore, both appellant and his wife testified that, before the trial, Martinson told them that the train did not stop at Holden street. Mrs. Kulp's language follows: "About a week after the accident, my husband and I called at his home. Martinson then stated to my husband in my presence that the train was traveling at the rate of ten miles an hour when going under the Lyndale bridge and that the reason for the slow speed was that they usually slowed down for the cross-over ahead, but that they did not stop because they were signalled to go ahead by the flagman."

From the conflict in testimony on this point, it appears that there was in the record substantial evidence to support the charge of negligence pleaded.

2. We take up next the question of whether there was substantial evidence that Kulp was on top of the train when it passed under the telltale. It must be conceded that he was on top of the train at the time the accident occurred which caused his death. The physical facts admit of no other conclusion. His body was found between 20 and 30 feet east of the eastern edge of the bridge. It lay with the body at the hips between the rails of the eastbound main, and the legs outside, beyond the south rail. His cap and lantern were found between the rails of the eastbound main line, and about 2 feet east of the eastern edge of the bridge. The bridge is 61½ feet wide. An examination of the cars showed blood marks on the southern or right hand wheels of the fifth car from the rear, and of all the cars behind it, including the caboose. This would indicate that Kulp fell from the top, between the fifth and sixth cars. The physical facts recited furnish no

other explanation. It is established that Kulp left the engine and boarded the caboose at Chaska Hill. That from some point he worked his way over the top toward the head-end must be conceded— whether from the point where he left the caboose after getting a drink of water and sitting a few minutes after Chaska Hill, as Helmer stated at the investigation held July 20, 1933, immediately after the accident, or from the caboose at Holden street, as he testified at this trial, in November, 1935, more than two years later. In no other way than over the top of the train could Kulp have arrived at the point where his body was found. That his position on top of the train was neither unusual nor improper is evidenced by rule 974 of the St. Louis Company requiring freight brakemen to be "on top of the train through yard limit stations and other localities where extra precaution is required, to assist in holding train or to pass signals." In his telegram to the general superintendent Helmer says that on leaving the caboose Kulp started over the top of the train to the head end. When he arrived at East Minneapolis, Helmer expected to find Kulp there to throw the switch. From this conflict of testimony alone we think the court would have been justified in submitting this issue to the jury. But it does not stand alone. Two witnesses, Fagan and Lindsey, switchmen in the employ of the St. Louis Company, were working in the Cedar Lake yard of that company, starting at midnight of July 19, 1933. This yard is situated 1½ miles west of the Lyndale bridge, is on the south side of the mainline tracks, and nearest to the eastbound main. They saw Omaha train No. 394 pass by at about 2:30 o'clock of the morning of July 20th. They saw a lamp on top of the train, carried by some one, and moving toward the head or engine end. The lamp was nearer the rear end of the train. Both witnesses were about 30 or 40 feet from the Omaha train when it passed. Both so testified at a prior trial of this case, and it transpired, in the course of their examination, that, before this trial, they were notified by the St. Louis Company to go to the office of the claim agent of the Omaha Company, who asked them whether the man or light they saw might not have been on a Great Northern train instead of on an Omaha train. An examination of their testimony does not disclose that it was materially disturbed by cross-examination. Their attention was especially directed to this incident on the night in question by the fact that a second Omaha train, eastbound, arrived about an hour later. The yardmaster directed it and all trains to be stopped at Cedar Lake; there was trouble; and they heard that a brakeman was missing.

For the defense two witnesses testified that they saw Omaha freight No. 394 pass at Eden Prairie, which is between 10 and 11 miles west of Lyndale bridge, and 6 miles west of Hopkins, and did not observe any light on top of the cars as they passed. The engineer and fireman of Omaha train No. 394, testified that there are about six curves between Chaska Hill and Cedar Lake yard, some on the engineer's side and some on the side of the fireman, and that the engineer or fireman, as the case may be, can see the full extent of a forty-car train at some of these curves if they look steadily and quickly enough. They say they did so look and saw no light on top of the cars of this train.

Under this specification of the defense we next examine whether there was substantial evidence from which the jury would have been justified in finding that the telltale frame was low enough to strike Kulp if he was standing on the box car when it passed the telltale.

Irving H. Buckle, freight claim agent for the St. Louis Company, and its claim adjuster, testifies that he went to the Lyndale bridge at 4:30 a. m. on July 20th and made an investigation. He used an I. C. car which the official register stated to be 14 feet 8 inches from the top of the rail to the top of the running board. The witness stated that this dimension, by his measurement, was increased to 15 feet, due perhaps to the car having been "shopped." He says further that the distance between the bottom of the telltale frame and the running board was 4 feet, 3 inches.

The sixth car of the train, from which Kulp concededly may have fallen, is an ordinary freight car 13 feet 3 inches in height from the top of the rail to the top of the running board. Kulp was 5 feet 5 inches in height, and, if the above measurements are correct, it would appear that the telltale frame would have hung appreciably above his head. Other

testimony introduced, however, points to a different possible conclusion.

Louis J. Bruneau, switchman for the St. Louis Company, discovered, between 4 and 5 o'clock p. m., July 19, 1933, that these frames were sagging. He passed under the telltales on an ordinary boxcar at about that hour. He is 5 feet 6 inches in height and says: "When I came to the telltales I had to stoop down or duck down, or otherwise I would have come in contact with them. * * * The bottom part of the frame would have come in contact with me just about the chest if I had remained standing. * * * I am talking about standing on an ordinary box car about 13 feet high."

He reported the condition of the telltale to the yardmaster, which led to the warning order to which reference has been made.

Arthur E. Reno, St. Louis Company switchman, and 5 feet 11½ inches in height, passed under this telltale at about 6 p. m. July 19th. He was standing on an ordinary box car about 13 feet high. He found the telltale frames were dangerously low. "The bottom of the frame was somewhere near my belt as I was standing on top of the car. * * * In riding on top of these cars, underneath the telltale I had to get down on one knee and duck."

John McCaffrey, switchman of the St. Louis Company, 5 feet 6 inches in height, testifies that on July 19, 1933, standing on an ordinary boxcar, he passed under the telltale over the westbound main track and observed this telltale over the eastbound main track. He says it was dangerously low as seen from his position on top of an ordinary box car. McCaffrey is the man shown standing upon the I. C. box car in Exhibit F, a photograph introduced in connection with the testimony of the witness Buckle. The picture shows that the frame struck McCaffrey appreciably below the shoulder. This measurement is not shown. Concerning it McCaffrey testifies: "Plaintiff's Exhibit 'F' is my picture and shows the frame of the telltale. It come a little ways from my belt. It is not way up near my shoulder. It is not nearer my shoulder. The frame is below the shoulder. It is not altogether at my belt. I testified at the other trials that the frame came to my belt and that is what I thought. The picture shows where it came."

From the language of the trial judge, in his oral opinion delivered in passing on the motion for a directed verdict, it is evident that he accepted the contention of defendant's counsel that the cause of the death was left "in the realm of speculation and conjecture." To support this contention chief reliance is placed upon the case of Chicago, Milwaukee & St. Paul Railway Company v. Coogan, 271 U.S. 472, 46 S.Ct. 564, 566, 70 L.Ed. 1041, and the principle therein announced. This case restates the well-known duty of a trial judge "to direct a verdict for one of the parties when the testimony and all the inferences which the jury reasonably may draw therefrom would be insufficient to support a different finding." Also, that "whenever circumstantial evidence is relied on to prove a fact, the circumstances must be proved and not themselves presumed." In that case the plaintiff, who had stepped in between two cars to couple hose, was shown to be confronted by two elements of danger—the starting of the train before he had removed himself from such danger, and the possibility, not proved,—that his foot had been caught by a section of pipe line which had been loosened and bent in such manner as to project more closely toward the ties. In the case at bar deceased was faced by but a single element of potential danger—the sagging telltale under which he must pass if he sought to reach the head end of the train over the tops of the cars. There can be no question that he did proceed in that manner, and, in that respect, it was for the triers of the fact to choose between the two theories presented by the evidence. Did he start when he left the caboose shortly after the train left Chaska Hill, as stated by Helmer in his reports, or after the train stopped at Holden street, if it did stop there, as afterwards testified by Helmer and Martinson at the trial? While the evidence in this case is largely circumstantial, still much is proved, when resolved from conflicting testimony; and reasonable inferences from facts so established are legitimate. Therein lies the normal function of a jury.

Concededly in passing upon a defendant's motion to direct a verdict it is the duty of the court to take the most favorable view of the plaintiff's evidence, and the inferences reasonably and legitimately to be drawn therefrom. Worthington v. Elmer (C.C.A.6) 207 F. 306. And where,

as here, on the evidence, reasonable men might well find that a man found in a mangled condition and dead was killed as a result of contact with a defective warning appliance, and it cannot be said that no such conclusion could be reached on the testimony, the question should be submitted to the jury. Paraphrased from Myers v. Pittsburgh Coal Company, 233 U.S. 184, 34 S.Ct. 559, 561, 58 L.Ed. 906. In the case just cited, the trial court did submit the case to the jury, and a verdict for plaintiff resulted. The Circuit Court of Appeals (203 F. 221), reversed, largely upon what it regarded "want of definite proof as to the manner in which Myers came to his death,—whether by contact with the wire, or, if so, whether that merely disabled him or he was only injured or stunned by the fall, was seized with vertigo or other sudden sickness and fell from the car for that reason, or lost his footing by some unexpected movement of the train, or voluntarily got off the car and stumbled and fell upon the track, or became bewildered in the dark, and mistakenly supposed himself to be in a place of safety."

The Supreme Court reversed the Circuit Court of Appeals, saying: "In our opinion, the trial court properly left the question to the jury upon testimony which, when fairly considered, might sustain the verdict. See Humes v. United States, 170 U.S. 210, 18 S.Ct. 602, 42 L.Ed. 1011."

This seems to meet the thought of the trial judge as expressed by the following language in his oral opinion: "There may have been a misstep, a jolt in stopping or starting, a coming in contact with some portion of the bridge while passing thereunder, or coming in contact with the telltale frame. While the latter is the basis of this action, yet the other ways mentioned, though not charged, might very well rank with the telltale cause under the evidence."

Kulp was an experienced brakeman, with no unusual or dangerous conditions confronting him in his progress toward the head end of the train except the defective telltale, and, perhaps, the bridge itself. It should be stated here that a careful examination of the bridge itself showed no contact with it by Kulp, nor is any such cause of the injury claimed. As said by this court in Terminal R. Association v. Farris, 69 F.(2d) 779, 785:

"In the absence of direct testimony, the simple suggestion of theories by the defense does not reduce the jury to mere speculation, and disqualify it from determining the cause of the injury complained of"—citing Wabash Screen Door Co. v. Black (C.C.A.6) 126 F. 721, 725. See, also, Sears, Roebuck & Co. v. Peterson (C.C.A.8) 76 F.(2d) 243; Reading Company v. Geary (C.C.A.4) 47 F.(2d) 142, 145, 79 A.L.R. 226; Perkins v. Northern Pacific Ry. Co. (C.C.A.9) 199 F. 712, 715; Railway Express Agency v. Little (C.C. A.3) 50 F.(2d) 59, 75 A.L.R. 963; Chesapeake & O. Ry. Co. v. Cowley (C.C.A. 4) 166 F. 283, 284.

We think there was in the conflicting testimony presented substantial evidence from which the jury might justifiably have found the negligence charged, and that the failure to warn deceased of the dangerous condition of the telltale was the proximate cause of death. The defense to this action, particularly as disclosed in the testimony of conductor Helmer and engineer Martinson, is presented in an unfavorable and unconvincing light. The former admits indifference to veracity and good faith in his account of the circumstances which led to this deplorable accident to a fellow employee. He was obviously sensible of his duty to convey warning of the danger to all members of the train crew. His first thought was that, if he had not seen Kulp since the warning message was received at Hopkins, he would not be held responsible and his job would not be in peril. He, therefore, fixed upon Chaska Hill, 12 or 15 miles west of Hopkins, as the point at which Kulp was last seen. Further consideration may have convinced him that that situation alone would not excuse. In his cross-examination at the trial he said: "I understood the order (the warning order) when I received it. I knew it was my duty to see that all members of the train crew knew the contents of the order. The deceased was a member of the train crew."

This duty was thus emphasized at the investigation, as witness the following questions and answers:

"Q. You know that M. & St. L. rules require to show train order to front brakeman when practicable. A. Yes, sir.

"Q. In view of that fact don't you think at Hopkins you should have made certain that Kulp got the information. A. I probably should.

"Q. Did this train stop for stop board. A. I think he just slowed up and almost stopped.

"Q. You don't think he came to full stop. A. I don't think so.

"Q. Will you please state in the record why before leaving Hopkins you did not give train order information to front brakeman. A. I figured he was on head end and the head end would tell him."

It may well be that this reflection accounts for his subsequent testimony placing Kulp in the caboose through Hopkins to Holden street, at which point a convenient stop had to be introduced by change in statement. Of course the reconcilement of this conflict was for the jury. See London Guarantee & Accident Co. v. Woelfle (C.C.A.8) 83 F.(2d) 325, 334.

It follows that the trial court erred in sustaining the motion for a directed verdict. The judgment below is reversed and remanded for a new trial.